BRENDA H. COMPTON AND CURT OLSON, PLAINTIFFS V.
DAVID M. KIRBY, DEFENDANT

No. COA02-43

(Filed 1 April 2003)

**1. Partnerships— de facto—formation of partnership—
directed verdict**

The trial court did not err in a breach of partnership agree-
ment, breach of fiduciary duty, constructive fraud, and unfair
and deceptive trade practices case by denying defendant's
motion for a directed verdict and by submitting to the jury the
issue of formation of a partnership, because plaintiffs presented
sufficient evidence from which the jury could conclude the
parties' business was a de facto partnership between plaintiffs
and defendant.

**2. Partnerships— breach of partnership agreement—di-
rected verdict**

The trial court did not err in a breach of partnership agree-
ment, breach of fiduciary duty, constructive fraud, and unfair
and deceptive trade practices case by denying defendant's
motion for a directed verdict and by submitting the issue of
breach of the partnership agreement, because there was suffi-
cient evidence to show that defendant admitted he never told
anyone that plaintiffs were his partners and stated that he had no
intention of sharing with plaintiffs the benefits of ownership he
acquired after the pertinent merger.

1

**3. Fiduciary Relationship— breach of fiduciary duty—constructive fraud**

The trial court did not err in an action regarding the dissolution of the parties' business arrangement by denying defendant's motion for a directed verdict and by submitting to the jury the issue of breach of fiduciary duty and open, fair, and honest dealings, and the issue of constructive fraud, because: (1) plaintiffs presented sufficient evidence to support their allegation that defendant engaged in self-dealing which constitutes a breach of a partner's fiduciary duties; and (2) a breach of fiduciary duty amounts to constructive fraud, and plaintiffs already established the existence of a fiduciary duty and a breach of that duty.

**4. Appeal and Error— preservation of issues—failure to assert in motion for judgment notwithstanding verdict**

Although defendant contends the trial court erred in a breach of partnership agreement, breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices case by submitting to the jury special interrogatories, this assignment of error is overruled because defendant failed to assert the special interrogatories issue in his motion for judgment notwithstanding the verdict as required by N.C. R. App. P. 10(b)(2), and therefore, he failed to preserve this issue for review.

**5. Damages and Remedies— actual damages—opinion of property owner—purchase agreement**

The trial court did not err in a breach of partnership agreement, breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices case by submitting the issue of actual damages to the jury, because: (1) the opinion of a property owner is competent evidence as to the value of such property; (2) plaintiffs presented evidence that defendant received over $250,000 in compensation for a business deal, and defendant admitted that he did not share any of the benefits with plaintiffs; and (3) plaintiffs introduced into evidence a draft purchase agreement where one company indicated it would purchase both the parties' company and another company.

**6. Unfair Trade Practices— treble damages—attorney fees—constructive fraud—in or affecting commerce—proximate cause**

The trial court did not err in an action regarding the dissolution of the parties' business arrangement by submitting jury

issues on unfair and deceptive trade practices (UDTP) and by awarding treble damages and attorney fees to plaintiffs, because: (1) North Carolina case law has held that conduct which constitutes a breach of fiduciary duty and constructive fraud is sufficient to support a UDTP claim, and the Court of Appeals already concluded that the issue of constructive fraud was properly submitted to the jury; (2) the jury properly found that defendant's actions were in or affecting commerce; and (3) plaintiffs successfully demonstrated that defendant's actions proximately caused their injury.

**7. Damages and Remedies— punitive damages—moot**

Although defendant contends the trial court erred in a breach of partnership agreement, breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices case by awarding $90,000 in punitive damages under N.C.G.S. § 1D-15(a)(1), this argument is moot because: (1) the trial court determined that defendant's conduct constituted a violation of N.C.G.S. § 75-1.1 and trebled the actual damages award to $195,000; and (2) plaintiffs were required to elect between the treble damages and the $90,000 punitive damages award, and chose treble damages.

Appeal by defendant from order and judgment entered 2 February 2001 by Judge Ronald L. Stephens in Wake County Superior Court. Heard in the Court of Appeals 21 January 2003.

*Hunton & Williams, by Christopher G. Browning, Jr., for plaintiff appellees.*

*Maupin Taylor & Ellis, P.A., by John I. Mabe, Jr., and Allen F. Reid, II, for defendant appellant.*

McCULLOUGH, Judge.

This case arises out of a business relationship between plaintiffs Brenda Compton and Curt Olson and defendant David Kirby. The evidence at trial showed that defendant worked in Charlotte as the President of Colliers Vinson International Property Consultants of Charlotte, Inc. (Colliers-Charlotte), a real estate brokerage firm owned by his father, Albert Kirby. Colliers-Charlotte was part of a larger entity called Colliers International, a loosely structured organization of independent commercial real estate brokers who cross-refer business to one another. In March 1996, defendant created a real estate brokerage firm called Colliers Vinson International Property

**COMPTON v. KIRBY**

[157 N.C. App. 1 (2003)]

Consultants of Raleigh, Inc. (Colliers Vinson of Raleigh). Defendant was the sole owner and President of Colliers Vinson of Raleigh, and plaintiffs were independent brokers who worked for him in Raleigh.

For the first nine months of its existence, Colliers Vinson of Raleigh operated without a valid real estate license due to an oversight by defendant's attorneys. On 11 December 1997, Colliers Vinson of Raleigh was administratively dissolved pursuant to N.C. Gen. Stat. § 55-14-21 for failure to file statutorily required annual reports. However, according to defendant, the business still existed and operated under the trade name of Vinson Property Consultants.

In the fall of 1996, Colliers International informed defendant that he could not use the Colliers name for his Raleigh corporation. Due to friction between Colliers International and Colliers Vinson of Raleigh and low business volume in Raleigh, defendant and his father considered closing the business and began discussing the matter with plaintiffs in September 1996. On 3 October 1996, plaintiffs met with both defendant and his father in Charlotte and the parties decided to keep the Raleigh office open. Plaintiffs and defendant agreed to change the business's name from Colliers Vinson of Raleigh to Vinson Property Consultants, and the appropriate assumed name certificate was filed in the Wake County registry.

Mr. Albert Kirby told both defendant and plaintiffs that his company would advance funds to Vinson Property Consultants to reimburse operating expenses while the office attempted to capture part of the Raleigh real estate market. According to plaintiffs, they and defendant agreed upon an arrangement whereby defendant owned 51% of Vinson Property Consultants, and each plaintiff owned 24.5%. Plaintiffs and defendant created a bank account in the name of Vinson Property Consultants, with the understanding that the money therein would be used to pay regular operating expenses. Plaintiffs deposited $24,000.00 of their personal funds into the account and told defendant that the money was a capital contribution into the partnership the three of them had just created. Each month, Vinson Property Consultants submitted a monthly tally of expenses to Colliers-Charlotte, and each month the Vinson account was reimbursed so that the bank account retained a $24,000.00 balance. Over time, Colliers-Charlotte advanced over $44,000.00 to Vinson Property Consultants.

One of the main goals of Vinson Property Consultants was to handle referrals from Colliers-Charlotte and to win approval as a

referral agency for business associated with the Colliers International network. As the business got underway, plaintiffs and defendant agreed that Vinson Property Consultants should be registered as a limited liability company. Plaintiffs prepared a draft of an operating agreement, but it was never finalized and no written agreement was ever made or signed by the parties. On 12 March 1997, plaintiff Curt Olson wrote a letter to defendant and confirmed the terms of the partnership agreement that he alleged existed between himself, defendant, and Ms. Compton. Defendant called Mr. Olson the same day and expressly recognized that the terms of the partnership set out in the letter were correct.

Plaintiffs signed contracts with third parties and became personally liable for the obligations of Vinson Property Consultants. After speaking with defendant, plaintiffs obtained approval for business cards which showed each plaintiff to be a "principal" in Vinson Property Consultants. Plaintiffs maintained that, in the real estate industry, the term "principal" is synonymous with "partner" and signifies ownership and control.

Throughout the trial, plaintiffs pointed to numerous instances in which defendant referred to and treated them as his partners. In late 1996, defendant approved an announcement in *Commercial Real Estate Today*, a regional real estate publication, which stated:

> David Kirby, President of Colliers Vinson International of Charlotte, North Carolina, announces the formation of Vinson Property Consultants, L.L.C. in Raleigh. Mr. Kirby is also very pleased to announce the addition of R. Curt Olson, CCIM and Brenda H. Compton as Principals in the firm.

Plaintiffs also presented the testimony of Mr. Ray McCrary, a prospective job applicant who spoke to defendant in early 1997. Mr. McCrary testified that defendant referred to plaintiffs as his partners and indicated that plaintiffs owned 49% of Vinson Property Consultants, while he owned the remaining 51%. Plaintiffs also introduced a number of documents approved (and, in some instances, signed) by defendant in which he recognized that plaintiffs were co-owners of Vinson Property Consultants. Additionally, plaintiffs were described as "partners" on their group health care application.

As a result of the discussions between themselves and defendant, plaintiffs worked approximately 60 to 70 hours per week to make the business successful. The primary goal was to make the business prof-

itable enough to earn the right to operate as part of the Colliers network of real estate brokerages. At trial, plaintiffs testified to both long work hours and a "very stressful" period. They also testified that their efforts took up a great deal of time and left them little opportunity to earn personal commissions.

In 1997, defendant and his father conducted negotiations for the sale of both Colliers-Charlotte and Vinson Property Consultants to Colliers Macaulay Nicolls, Inc. (CMN), a large affiliate of the Colliers network. When plaintiffs learned of the possible sale and merger, they agreed that defendant was in the best position to represent the interests of Vinson Property Consultants, due to his history of association with the Colliers network. Plaintiffs allowed the discussions to proceed with the belief that defendant was negotiating on their behalf, as well as his own. However, plaintiffs later learned that, during the discussions, defendant indicated he was the sole owner of Vinson Property Consultants. Plaintiffs eventually contacted CMN and informed its representatives of their co-ownership interest in Vinson Property Consultants and their belief that the business was a partnership consisting of themselves and defendant. CMN reviewed the business records of both Colliers-Charlotte and Vinson Property Consultants and decided not to purchase Vinson Property Consultants because of its disputed ownership and its low value.

In December 1997, defendant wrote to plaintiff Brenda Compton and asked her to execute a release of her rights of ownership in Vinson Property Consultants. She refused. In February 1998, the following sales and transfers occurred in a single large transaction: Mr. Albert Kirby sold most of the assets of Colliers-Charlotte to defendant, including the exclusive right to use the Colliers name in Charlotte. Defendant sold 85% of that acquisition to CMN, who in turn divided its purchase with Colliers Pinkard (another Colliers affiliate located in Baltimore, Maryland). Defendant, CMN, and Colliers Pinkard then merged their assets into a newly formed entity called Colliers N.C. Partners, LLC. In September 1997, the licensor and owner of the Colliers name gave CMN satellite rights to develop the Colliers name in Raleigh for one year. After its formation, Colliers N.C. Partners, LLC obtained the right to use the Colliers name in Charlotte from defendant and the satellite rights to develop the Colliers name in the Raleigh market from CMN.

On 13 February 1998, defendant was named President of Colliers N.C. Partners, LLC and owned 15% of the new business. Defendant

COMPTON v. KIRBY

[157 N.C. App. 1 (2003)]

also received $80,000.00 in cash, a guaranteed salary of $72,000.00 per year for two years, a car allowance, and payment of his dues in a number of private clubs. Plaintiffs received no compensation or other consideration as a result of the transaction and were ordered to vacate the Raleigh office immediately. They were also informed that their $24,000.00 capital contribution to Vinson Property Consultants would not be returned.

On 20 February 1998, plaintiffs filed a complaint against defendant, Colliers Pinkard, and CMN, alleging the existence of a partnership between themselves and defendant and demanding a number of remedies based upon the dissolution of their business arrangement. The same day, plaintiffs also obtained an *ex parte* temporary restraining order which ordered defendant to refrain from "(1) ousting Plaintiffs from their business premises . . . and interfering with Plaintiffs' ongoing business; and (2) selling the partnership Vinson Property Consultants, or distributing its assets to the exclusion of Plaintiffs[.]" On 5 March 1998, the trial court entered a preliminary injunction which prevented defendant from taking action to dissolve, sell, or distribute the assets of Vinson Property Consultants without plaintiffs' participation.

On 1 October 1998, plaintiffs filed an amended complaint which included allegations of breach of a partnership agreement, breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices against defendant. Defendant answered and asserted a number of defenses. On 27 August 1999, defendant filed a motion for summary judgment, which was subsequently denied by the trial court on 15 September 1999. The case proceeded to a trial by jury at the 21 August 2000 Civil Session of Wake County Superior Court.

During the trial, plaintiffs presented the testimony of five witnesses. Plaintiffs testified about the financial arrangement between themselves, defendant, and Mr. Albert Kirby for operating funds for Vinson Property Consultants; the correspondence between themselves, defendant, and others; and drafts of the proposed limited liability company agreement. Both plaintiffs testified that defendant acknowledged an intent to enter into a partnership with them to operate a new business in Raleigh that superceded the corporation for which plaintiffs originally worked. Plaintiffs further testified they were entitled to damages because defendant did not acknowledge them as his partners from September 1997 to January 1998, the time during which the sale transaction occurred and when Colliers N.C. Partners, LLC was formed. Plaintiffs reiterated that one of the goals

for their partnership with defendant was to perform well and earn an affiliation with the Colliers network. Plaintiffs consistently argued that defendant was supposed to obtain the Raleigh satellite rights for the use and benefit of Vinson Property Consultants, that he did in fact obtain the satellite rights after the merger, but that he misappropriated them.

When defendant moved for directed verdict at the close of plaintiffs' evidence, the trial court took the matter under advisement and instructed defendant to proceed with the presentation of his evidence. Defendant presented the testimony of several witnesses, including Mr. David Frederick, the Chief Operating Officer of Colliers Pinkard and a representative of Colliers N.C. Partners, LLC. Mr. Frederick explained the 1997 sale and transfers as follows: in 1997, the Colliers network re-evaluated Colliers-Charlotte because it had not satisfactorily kept up with managerial and technological changes necessary for it to be a profitable business. After review, the Colliers network told Colliers-Charlotte it could either combine with a large Colliers affiliate which could financially back it and boost its operations or lose its right to use the Colliers name. Colliers-Charlotte chose to combine with CMN, with the understanding that the assignment of satellite rights in North Carolina depended upon CMN's initial involvement and later involvement by Colliers Pinkard. Mr. Frederick further testified that the Colliers satellite rights were eventually controlled by Colliers N.C. Partners, LLC, an entity which was 85% owned by a sizeable Colliers affiliate. Defendant's 15% interest was comprised of Colliers-Charlotte contracts, but not Vinson Property Consultants. According to Mr. Frederick, even though defendant owned 15% of Colliers N.C. Partners, LLC, he never controlled the Colliers satellite rights and was not a decision-maker for Colliers N.C. Partners, LLC. Vinson Property Consultants was not part of the merger between Colliers-Charlotte, CMN, and Colliers Pinkard. In fact, plaintiffs continued to do business in Raleigh, but changed the name of their Raleigh office to International Property Consultants.

Defendant also testified on his own behalf. He stated that he was the sole owner of Vinson Property Consultants and that plaintiffs worked for him; plaintiff Compton was the manager and plaintiff Olson was the broker-in-charge. Defendant asserted that he never agreed to form a partnership with plaintiffs and that plaintiffs mistakenly thought otherwise. Defendant testified that plaintiffs referred to Vinson Property Consultants as a corporation and signed documents which stated the business was a corporation. He also pointed

out that when they applied for renewal of their real estate licenses, they stated they were employed by the Raleigh corporation owned by him. Defendant also stated that he never had control of the Colliers satellite rights and therefore could not have misappropriated them to the detriment of Vinson Property Consultants and plaintiffs.

Defendant's renewed motion for directed verdict at the close of all the evidence was denied. The jury agreed with plaintiffs that a partnership existed between plaintiffs and defendant, and that defendant's failure to acknowledge the partnership amounted to a breach of his fiduciary duty. The jury's determination that defendant breached his fiduciary duty led to a verdict against him for constructive fraud, which itself became the basis for an award of treble damages (pursuant to N.C. Gen. Stat. §§ 75-1.1 and 75-16 (2001)) and attorney's fees for plaintiffs (pursuant to N.C. Gen. Stat. § 16.1 (2001)). Damages were originally calculated based on (1) the price for which defendant sold part of Colliers-Charlotte, and (2) defendant's continued compensation.

On 15 September 2000, the trial court entered judgment for plaintiffs in the sum of $185,000.00 with interest from 20 February 1998 at the statutory rate of 8% per year, plus costs. Prior to entry of judgment defendant was given a $10,000.00 credit due to a pretrial settlement between plaintiffs and the other original defendants in the lawsuit. Defendant made timely motions for a new trial and for judgment notwithstanding the verdict (JNOV), which were denied on 22 December 2000. An amended judgment (awarding costs and attorney fees to plaintiffs along with the previous judgment) was entered on 2 February 2001, and defendant appealed on 2 March 2001.

On appeal, defendant argues the trial court committed reversible error by submitting to the jury a number of issues regarding the alleged partnership, including (I) the formation of the partnership; (II) the breach of the partnership agreement; and (III) the breach of fiduciary duty and open, fair, and honest dealing by defendant. Defendant also assigns error to the trial court's submission of (IV) special interrogatories to the jury, as well as the trial court's submission of the issues of (V) actual damages; (VI) punitive damages; and (VII) unfair trade practices and the subsequent award of treble damages and attorney's fees to plaintiffs. Lastly, defendant argues the trial court erred by (VIII) denying his motions for summary judgment, directed verdict, and JNOV. For the reasons stated herein, we conclude defendant received a trial free from error.

Our standard of review from the denial of a motion for directed verdict or JNOV is "whether, upon examination of all the evidence in the light most favorable to the nonmoving party, and that party being given the benefit of every reasonable inference drawn therefrom, the evidence is sufficient to be submitted to the jury." *Fulk v. Piedmont Music Ctr.*, 138 N.C. App. 425, 429, 531 S.E.2d 476, 479 (2000). "If there is more than a scintilla of evidence supporting each element of the plaintiff's case, the directed verdict motion should be denied. Review by an appellate court is limited to examining the grounds asserted in the directed verdict motion." *Little v. Matthewson*, 114 N.C. App. 562, 565, 442 S.E.2d 567, 569 (1994) (citation omitted), *aff'd*, 340 N.C. 102, 455 S.E.2d 160 (1995). Thus, a motion for directed verdict should be denied "unless it appears, as a matter of law, that a recovery cannot be had by the plaintiff upon any view of the facts which the evidence reasonably tends to establish." *Graham v. Gas Co.*, 231 N.C. 680, 683, 58 S.E.2d 757, 760 (1950). With these concepts in mind, we turn to the arguments presented by the parties.

## Formation of the Partnership

**[1]** By his first assignment of error, defendant argues the trial court committed reversible error by submitting to the jury the issue of formation of a partnership because no partnership *de jure* was formed and the parties conducted business in the form of a corporation as a matter of law. Plaintiffs, on the other hand, contend the issue was properly submitted to the jury because a *de facto* partnership arose between themselves and defendant. Upon review, we agree with plaintiffs.

N.C. Gen. Stat. § 59-36 (2001) defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit."

> A partnership is a combination of two or more persons of their property, effects, labor, or skill in a common business or venture, under an agreement to share the profits or losses in equal or specified proportions, and constituting each member an agent of the others in matters appertaining to the partnership and within the scope of its business.

*Zickgraf Hardwood Co. v. Seay*, 60 N.C. App. 128, 133, 298 S.E.2d 208, 211 (1982). "To prove existence of a partnership, an express agreement is not required; the intent of the parties can be inferred by their conduct and an examination of all of the circumstances." *Wike v.*

*Wike*, 115 N.C. App. 139, 141, 445 S.E.2d 406, 407 (1994). A partnership may be inferred from all the circumstances, so long as the circumstances demonstrate a meeting of the minds with respect to the material terms of the partnership agreement. *See Davis v. Davis*, 58 N.C. App. 25, 293 S.E.2d 268, *disc. review denied*, 307 N.C. 127, 297 S.E.2d 399 (1982).

> "Partnership is a legal concept but the determination of the existence or not of a partnership, as in the case of a trust, involves inferences drawn from an analysis of 'all the circumstances attendant on its creation and operation.' "

> Not only may a partnership be formed orally, but "it may be created by the agreement or conduct of the parties, either express or implied[.]" . . . "A voluntary association of partners may be shown without proving an express agreement to form a partnership; and a finding of its existence may be based upon a rational consideration of the acts and declarations of the parties, warranting the inference that the parties understood that they were partners and acted as such."

*Eggleston v. Eggleston*, 228 N.C. 668, 674, 47 S.E.2d 243, 247 (1948) (citations omitted).

In the present case, plaintiffs acknowledge that they originally worked as independent brokers at defendant's corporation, Colliers Vinson of Raleigh. Despite this fact, the inference of a new partnership relationship may be drawn from acts which refute the prior relationship. Thus, in order to prevail, plaintiffs had to present evidence from which the jury could conclude that plaintiffs and defendant agreed "to carry on as co-owners a business for profit" in 49% and 51% shares. *See Williams v. Biscuitville, Inc.*, 40 N.C. App. 405, 253 S.E.2d 18, *disc. review denied*, 297 N.C. 457, 256 S.E.2d 810 (1979). Defendant contends plaintiffs' evidence is insufficient as a matter of law to show the parties reached a meeting of the minds with respect to the critical terms of their alleged partnership.

When considering all the evidence in the light most favorable to plaintiffs, as we are obligated to do, we conclude that plaintiffs did present sufficient evidence of a partnership to survive defendant's motion for directed verdict, despite defendant's arguments to the contrary. Plaintiffs correctly point out that "[i]t is immaterial that the parties intended to reduce their agreement to writing at a later date. A partnership may be formed by an oral agreement." *Campbell v.*

*Miller*, 274 N.C. 143, 149, 161 S.E.2d 546, 550 (1968). *See also Potter v. Homestead Preservation Assn.*, 330 N.C. 569, 576, 412 S.E.2d 1, 4 (1992). Plaintiffs provided sufficient evidence from which the jury could conclude that they and defendant were partners. Specifically, plaintiffs testified they and defendant met on 3 October 1996 and agreed to become partners in Vinson Property Consultants. This intent was repeated in plaintiff Olson's 12 March 1997 letter to defendant. In pertinent part, Mr. Olson's letter stated:

Dear David:

I wanted to write this letter to you to set forth my understanding of what we are trying to accomplish here in Raleigh. Having worked long and hard for the previous seven months, I believe that it is time for my Partner Agreement to be put in writing and formalized. We have discussed the need for this many times.

* * * *

It is my understanding, that when the new company [the LLC] is formed, the terms of our relationship will be as follows:

VPC started January 1, 1997.

Commissions are split 50/50 with the firm.

After $150,000 in gross commissions, a new split of 60/40 occurs.

VPC provides or reimburses health insurance for Principals'. [sic] Principals' family members must reimburse VPC.

Brenda and I opened the business checking account with $24,000 from our personal funds, to pay bills. Reimbursement would be made by Colliers Vinson of Charlotte twice each month to replenish the account.

David Kirby owns 51 percent of VPC. Brenda and I share the remaining 49 percent.

When VPC acquires satellite status or Colliers recognition, David Kirby will reduce his share of stock to 25 percent by giving shares to Curt and Brenda. VPC will have responsibility for payment of all bills after this occurs.

After 18 months, Brenda and I will share 15 to 20 percent of our stock with other partners. New partners will receive three to five percent of stock which will be purchased at the going rate.

COMPTON v. KIRBY

[157 N.C. App. 1 (2003)]

Colliers Vinson of Charlotte has provided Errors & Omissions insurance to Principals of VPC.

Shortly after Mr. Olson faxed the letter to defendant, he and defendant spoke on the phone. Mr. Olson testified that

> [H]e was very quiet. Again I took the lead in the discussion because it was a quiet phone call, and I just said, David I've been here a very good while, I need to know what we've got here and make sure everything is correct. That's all I'm trying to do. And I said, Is it correct? And he said, Yes.

Though defendant denied this at trial, the jury heard testimony from both plaintiffs and defendant and ultimately accorded more weight to plaintiffs' testimony. Additionally, plaintiffs and defendant opened a bank account at First Union and signed an agreement stating that Vinson Property Consultants was an "unincorporated business owned entirely by the undersigned." Plaintiffs' and defendant's signatures followed. Plaintiff Brenda Compton testified she told defendant that her and Mr. Olson's $24,000.00 deposit was a capital contribution into the business.

During the trial, plaintiffs contended defendant knew of several instances in which they described themselves as and acted as his partners. Plaintiffs introduced a number of contracts in which they, as principals of Vinson Property Consultants, contracted with companies for services in furtherance of their business. Plaintiffs indicated that they notified defendant of these documents, and his signature appears next to plaintiffs' signatures on several of those contracts. Similarly, defendant knew plaintiffs were holding themselves out as "principals" of Vinson Property Consultants and approved business cards describing plaintiffs as principals. Plaintiffs presented testimony from a number of people, including defendant's father, who stated that the term "principal" is synonymous with ownership in the real estate industry. Defendant himself wrote an announcement describing plaintiffs as principals in Vinson Property Consultants and explained to others that he owned 51% of the business while plaintiffs owned the other 49%. One prospective job applicant, Mr. Ray McCrary, testified that defendant referred to plaintiffs as his "partners."

In response to defendant's assertion that Vinson Property Consultants was a corporation rather than a partnership, plaintiffs argued that, during the time in question, the corporation did not exist

because it had previously been dissolved. They therefore contend that Vinson Property Consultants, as a matter of law, was not a corporation. Plaintiffs also indicated that the North Carolina Real Estate Commission was notified of the partnership shortly after it was created; the Real Estate Commission later informed Mr. Olson that he should wait until the written partnership agreement was signed before he changed the company's business license. Plaintiffs further testified that the written partnership agreement was not finalized because defendant's attorney became sick and died.

The evidence presented at trial was replete with contested issues of fact. When faced with the conflicting factual accounts presented by the parties, the jury weighed and considered the evidence and accorded more weight to plaintiffs' rendition. We hold the trial court properly denied defendant's motion for directed verdict because plaintiffs presented sufficient evidence from which the jury could conclude that Vinson Property Consultants was a partnership between themselves and defendant. Defendant's first assignment of error is overruled.

### Breach of the Partnership Agreement

[2] By his second assignment of error, defendant argues the trial court erred by submitting to the jury the issue of breach of the partnership agreement because there was insufficient evidence that he exercised control over the use of the Colliers name. Plaintiffs, on the other hand, argue that defendant's conduct throughout the negotiations with CMN and Colliers Pinkard constituted a breach of the partnership agreement.

Plaintiffs presented testimony that defendant reached a deal with CMN and Colliers Pinkard in February 1998. As a result of the deal, defendant informed plaintiffs that he was keeping all the assets of Vinson Property Consultants, including its name, and indicated that plaintiffs were not part of the deal. When questioned at trial, defendant admitted he never told anyone that plaintiffs were his partners and stated he had no intention of sharing with plaintiffs the benefits of ownership he acquired after the merger.

Based on the foregoing, we hold the trial court properly submitted the issue of breach of the partnership agreement to the jury because plaintiffs presented sufficient evidence to survive defendant's motion for directed verdict. Defendant's second assignment of error is overruled.

## Breach of Fiduciary Duty; Open, Fair, and
## Honest Dealing; and Constructive Fraud

[3] Defendant next argues the trial court erred by submitting to the jury the issue of breach of fiduciary duty and open, fair and honest dealing by him because as a matter of law there was no partnership and no breach of a partnership agreement. He also contends the issue of constructive fraud was improperly presented to the jury. We do not agree.

A fiduciary duty "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931). In *Casey v. Grantham*, 239 N.C. 121, 124-25, 79 S.E.2d 735, 738 (1954), our Supreme Court stated:

> It is elementary that the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith in their dealings with one another in respect to partnership affairs. Each is the confidential agent of the other, and each has a right to know all that the others know, and each is required to make full disclosure of all material facts within his knowledge in any way relating to the partnership affairs.

This principle is codified within the North Carolina Uniform Partnership Act, N.C. Gen. Stat. §§ 59-31 to -73 (2001). N.C. Gen. Stat. § 59-50 requires partners to "render on demand true and full information of all things affecting the partnership to any partner[.]" N.C. Gen. Stat. § 59-51 states:

> (a) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property.

As previously discussed, plaintiffs presented evidence that defendant entered into a merger with CMN and Colliers Pinkard and did not share the benefits of the merger with plaintiffs. Plaintiffs alleged that defendant engaged in self-dealing, which constitutes a breach of a partner's fiduciary duties. *See Reddington v. Thomas*, 45 N.C. App. 236, 262 S.E.2d 841 (1980). Because plaintiffs presented evidence in support of their allegation, the trial court properly submitted this issue to the jury.

In a related assignment of error, defendant argues the trial court erred in submitting the issue of constructive fraud to the jury. However, a breach of fiduciary duty amounts to constructive fraud. "Once plaintiff established a *prima facie* case that defendant[] owed plaintiff a fiduciary duty and that duty was breached, which amounted to constructive fraud, the burden of proof shifted to defendants to prove that they acted in an open, fair and honest manner[.]" *HAJMM Co. v. House of Raeford Farms*, 94 N.C. App. 1, 12, 379 S.E.2d 868, 874 (1989), *modified in part and rev'd in part on other grounds*, 328 N.C. 578, 403 S.E.2d 483 (1991). As we have already determined that plaintiffs established the existence of a fiduciary duty and a breach of that duty, we likewise conclude the issue of constructive fraud was properly submitted to the jury.

## Special Interrogatories

[4] By his next assignment of error, defendant argues the trial court erred by submitting to the jury special interrogatories on the issues of (1) whether defendant negotiated for his own benefit in regard to the potential sale of Vinson Property Consultants or the right to operate as a Colliers affiliate in the Raleigh market, and (2) whether defendant falsely represented that he was the owner of Vinson Property Consultants.

A JNOV motion is "essentially a renewal of a motion for directed verdict," *Smith v. Price*, 74 N.C. App. 413, 418, 328 S.E.2d 810, 815 (1985), *aff'd in part, rev'd in part on other grounds*, 315 N.C. 523, 340 S.E.2d 408 (1986), and thus must be preceded by a motion for directed verdict at the close of all evidence. *See Whitaker v. Earnhardt*, 289 N.C. 260, 264, 221 S.E.2d 316, 319 (1976). On appeal, we apply the same standard of review as that for a directed verdict. *See Northern Nat'l Life Ins. Co. v. Miller Machine Co.*, 311 N.C. 62, 69, 316 S.E.2d 256, 261 (1984). Notably, "[t]he movant cannot assert grounds [for the JNOV] not included in [his] motion for directed verdict." *Love v. Pressley*, 34 N.C. App. 503, 509, 239 S.E.2d 574, 580, *cert. denied*, 294 N.C. 441, 241 S.E.2d 843 (1978).

*Barnard v. Rowland*, 132 N.C. App. 416, 421, 512 S.E.2d 458, 463 (1999). Defendant failed to assert the special interrogatories issue in his motion for JNOV and consequently failed to preserve the issue for our review. *See* N.C.R. App. P. 10(b)(2) (2002). Accordingly, his assignment of error is overruled.

### Actual Damages

**[5]** By his fifth assignment of error, defendant argues the trial court erred by submitting the issue of actual damages to the jury because plaintiffs did not present sufficient evidence of actual damages. We do not agree.

"The burden of proving damages is on the party seeking them. As part of its burden, the party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 547-48, 356 S.E.2d 578, 586, *reh'g denied*, 320 N.C. 639, 360 S.E.2d 92 (1987) (citations omitted). "Absolute certainty is not required, but evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion." *Tillis v. Cotton Mills*, 251 N.C. 359, 366, 111 S.E.2d 606, 612 (1959).

In the present case, the jury awarded plaintiffs $65,000.00 in actual, compensable damages. Defendant argues the jury awarded plaintiffs damages using a "lost opportunity" theory of recovery and made its calculations based upon his salary and benefits, as well as the sale of 85% of Colliers-Charlotte's assets to CMN. He contends the sale of Colliers-Charlotte's assets cannot be the basis for the damages award because that company was a distinctly separate business in Charlotte and had no bearing upon the calculation of damages. He further points out that Vinson Property Consultants did not have a history of profits and was not succeeding financially. In short, defendant argues that plaintiffs did not provide tangible evidence of damages, but rather relied on speculation, which is an insufficient basis upon which a jury may award damages. *Olivetti*, 319 N.C. at 547-48, 356 S.E.2d at 586; *see also McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 407-08, 466 S.E.2d 324, 329, *disc. review denied*, 343 N.C. 307, 471 S.E.2d 72 (1996).

The record indicates that plaintiffs paid $24,000.00 of their personal funds into a First Union bank account in the name of Vinson Property Consultants. Plaintiff Brenda Compton told defendant this money was a capital contribution and would be used to pay bills. She also testified that she and Mr. Olson contributed the money with the belief that defendant would recognize their ownership interest in Vinson Property Consultants. When the merger was completed in February 1998, defendant informed plaintiffs that their $24,000.00 would not be returned to them.

The jury also heard testimony from plaintiffs regarding their long work hours in furtherance of the business. Ms. Compton testified she and Mr. Olson worked approximately 60-70 hours per week from 3 October 1996 to 18 February 1998. Plaintiffs estimated that they worked about 3,000 hours more than they would have if they were mere employees of Vinson Property Consultants, and testified a commercial real estate worker earned approximately $36.00 per hour. Plaintiffs argued that the jury could have awarded actual damages of $108,000.00 ($36.00 per hour x 3,000 hours), plus $24,000.00 for their capital contribution. They therefore contend an award of $65,000.00 is well within reason.

Plaintiff Curt Olson testified that he sent defendant a letter on 31 October 1997 in which he assessed the value of the partnership interest and opportunity he believed defendant took from him and Ms. Compton. Each of Mr. Olson's calculations exceeded $50,000.00. We note that the opinion of a property owner is competent evidence as to the value of such property. *See* Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 180 (5th ed. 1998).

In August 1997, defendant and his father signed a letter of intent with CMN concerning the sale of Colliers-Charlotte and Vinson Property Consultants. The letter recognized that the value of Vinson Property Consultants was equal to the value of Colliers-Charlotte. Over time, as defendant learned that plaintiffs considered themselves his partners, he restructured the deal with CMN so that he and his father would sell Colliers-Charlotte's physical assets to CMN, as well as the right to operate a Colliers office in Raleigh, while CMN would acquire the satellite rights to Raleigh from Colliers International and in turn would transfer those rights to the new company, Colliers N.C. Partners, LLC. In return, defendant received $80,000.00 in cash, a two-year guaranteed salary of $144,000.00, a $15,600.00 car allowance, payment of club dues totaling $8,560.00, $12,000.00 of guaranteed vacation pay, 15% ownership of Colliers N.C. Partners, LLC and the title of President, and a number of additional benefits. Defendant received over $250,000.00 in compensation for the deal, and admitted he did not share any of the benefits with plaintiffs.

Additionally, plaintiffs introduced into evidence a draft purchase agreement wherein CMN indicated it would purchase both Colliers-Charlotte and Vinson Property Consultants. The consideration, which would flow to defendant, was 5000 shares of CMN stock, with a par value of $8 per share. The agreement was never signed. However, defendant conceded that, had it been signed, plaintiffs would have

been entitled to 49% of the benefit flowing to Vinson Property Consultants. Later, on 10 December 1997, the terms of the deal changed; Vinson Property Consultants was no longer part of the sale, and 10,000 shares of CMN stock was designated for defendant. In lieu of the 10,000 shares, defendant received $80,000 in cash.

Based on this evidence, we conclude that plaintiffs presented sufficient evidence of actual damages for the issue to go to the jury. As the jury's award was based on the evidence and appears reasonable, this assignment of error is overruled.

## Unfair and Deceptive Trade Practices and Treble Damages

[6] By his next assignment of error, defendant argues the trial court erred by submitting jury issues on unfair and deceptive trade practices (UDTP) and by awarding treble damages and attorney fees to plaintiffs because the Unfair Trade Practices Act does not apply to this situation. Upon review, we do not agree.

N.C. Gen. Stat. § 75-1.1 (2001) provides:

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(b) For purpose of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

\* \* \* \*

(d) Any party claiming to be exempt from the provisions of this section shall have the burden of proof with respect to such claim.

"In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). We review each element in turn.

A trade practice is unfair if it is "immoral, unethical, oppressive, unscruplous, [sic] or substantially injurious[.]" *Johnson v. Insurance Co.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980), *overruled on other*

*grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385 (1988), *reh'g denied*, 324 N.C. 117, 377 S.E.2d 235 (1989). A trade practice is deceptive if it " 'possesse[s] the tendency or capacity to mislead, or create[s] the likelihood of deception.' " *Forsyth Memorial Hospital v. Contreras*, 107 N.C. App. 611, 614, 421 S.E.2d 167, 170 (1992) (quoting *Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 453, 279 S.E.2d 1, 7 (1981)), *disc. review denied*, 333 N.C. 344, 426 S.E.2d 705 (1993) (citations omitted). A party may be guilty of unfair or deceptive acts or practices when it engages in conduct that amounts to an "inequitable assertion of its power or position." *Edwards v. West*, 128 N.C. App. 570, 575, 495 S.E.2d 920, 924 (citations omitted), *cert. denied*, 348 N.C. 282, 501 S.E.2d 918 (1998).

North Carolina case law has held that conduct which constitutes a breach of fiduciary duty and constructive fraud is sufficient to support a UDTP claim. *Spence v. Spaulding and Perkins, Ltd.*, 82 N.C. App. 665, 668, 347 S.E.2d 864, 866 (1986). *See also HAJMM Co.*, 94 N.C. App. at 14, 379 S.E.2d at 876; and *Wilson v. Wilson-Cook Medical, Inc.*, 720 F.Supp. 533, 542 (M.D.N.C. 1989). Because we have already held that the issue of constructive fraud was properly submitted to the jury, defendant's argument that the UDTP claim is improper must fail.

We also believe the jury properly found that defendant's actions were "in or affecting commerce." Defendant's actions revolved around the sale of a business; namely, the sale of Colliers-Charlotte's assets to CMN and the later formation of Colliers N.C. Partners, LLC with both CMN and Colliers Pinkard. Defendant's actions clearly affected commerce in this State, particularly the availability of a Colliers affiliate in the Raleigh real estate market and the general marketing and sale of commercial real estate in that market. *See Walker v. Sloan*, 137 N.C. App. 387, 529 S.E.2d 236 (2000) (Where an employee group unsuccessfully tried to buy out the American Express Financial Advisors office in which they worked and were later terminated, they successfully alleged a Chapter 75-1.1 claim against the defendant, who engaged in "bad faith business dealing" to defeat their buyout attempt.).

Finally, we believe plaintiffs successfully demonstrated that defendant's actions proximately caused their injury. Based on the foregoing, we believe the trial court properly submitted this issue to the jury, and defendant's assignment of error is overruled.

### Punitive Damages

[7] In his next assignment of error, defendant contends his actions were justified, so that the punitive damages award of $90,000.00 was unwarranted. We disagree.

Punitive damages are justified in cases of constructive fraud, N.C. Gen. Stat. § 1D-15(a)(1) (2001), as long as "some compensatory damages have been shown with reasonable certainty." *Olivetti*, 319 N.C. at 549, 356 S.E.2d at 587. Damages assessed for UDTP violations pursuant to N.C. Gen. Stat. § 75-1.1 are trebled automatically. *See* N.C. Gen. Stat. § 75-16 (2001); and *Pinehurst, Inc. v. O'Leary Bros. Realty*, 79 N.C. App. 51, 61, 338 S.E.2d 918, 924, *disc. review denied*, 316 N.C. 378, 342 S.E.2d 896 (1986). Plaintiffs can assert both UDTP violations under N.C. Gen. Stat. § 75-1.1 and fraud based on the same conduct or transaction. Successful plaintiffs may receive punitive damages or be awarded treble damages, but may not have both. *Mapp v. Toyota World, Inc.*, 81 N.C. App. 421, 426, 344 S.E.2d 297, 301, *disc. review denied*, 318 N.C. 283, 347 S.E.2d 464 (1986).

As previously discussed, plaintiffs successfully alleged a UDTP claim. The trial court determined that defendant's conduct constituted a violation of § 75-1.1 and trebled the actual damages award to $195,000.00. Plaintiffs were required to elect between the treble damages and the $90,000.00 punitive damages award, and chose treble damages. Defendant's arguments regarding punitive damages are therefore moot, and this assignment of error is overruled.

### Motions for Summary Judgment, Directed Verdict, and JNOV

In his final assignment of error, defendant argues the trial court erred in denying his motions for summary judgment, directed verdict, and JNOV. However, after considering the scope of our review as well as the evidence presented by plaintiffs, we believe the trial court correctly denied all of defendant's motions. Accordingly, his final assignment of error is overruled.

Upon careful review of the record, transcripts, and the arguments presented by the parties, we believe the trial court acted properly in all respects. We conclude defendant received a fair trial, free from error.

No error.

Chief Judge EAGLES and Judge ELMORE concur.