DEALERS SUPPLY COMPANY,
INC., Plaintiff,

v.

CHEIL INDUSTRIES, INC., and
SAMSUNG CHEMICAL
(USA), Defendants.

No. 1:03CV00654.

United States District Court,
M.D. North Carolina.

Dec. 13, 2004.

James H. Hughes, Hutson Hughes & Powell, Durham, NC, for Plaintiff.

J. Michael Crowell, Daniel W. Clark, Tharrington Smith, Raleigh, NC, for Defendants.

### MEMORANDUM OPINION AND ORDER

OSTEEN, District Judge.

Plaintiff Dealers Supply Company, Inc. ("Dealers"), a North Carolina corporation, brings this action against Defendants Cheil Industries, Inc. ("Cheil"), a Korean corporation, and Samsung Chemical (USA), Inc. ("Samsung"), one of its California subsidiaries (collectively, "Cheil/Samsung" [1]). Plaintiff brings claims against Defendants for breach of an oral distributorship agreement, or in the alternative, breach of a partnership agreement; negligent misrepresentation; and unfair and deceptive trade practices pursuant to Chapter 75 of the North Carolina General Statutes. This matter is now before the court on Defendants' motion to dismiss. For the reasons set forth herein, Defendants' motion will be DENIED in part and GRANTED in part.

## I. BACKGROUND

The following facts are presented in the light most favorable to Plaintiff.[2]

Plaintiff Dealers is a Durham, North Carolina, wholesale distributor of flooring and solid surface counter top and sink materials for various manufacturers. Defendant Cheil manufactures in Korea a solid surface counter top and sink product known as Staron and sells the Staron product in the United States through its U.S. subsidiary, Samsung.

In the fall of 2000, Dealers made several telephone inquiries to Cheil/Samsung about distributing Staron. Although Defendants initially were not receptive to a distributor relationship with Dealers, a meeting was later held at Dealers' office in Durham, North Carolina. Present at the meeting were various representatives of Dealers along with Kathy Lee, a Mr. Chun, and other representatives of Cheil/Samsung. As a result of the meeting, an oral distributorship agreement was entered into by the parties, providing for a seven-year distributorship of Staron and granting Dealers the exclusive territory of

---

**1.** In its complaint, Dealers rarely differentiates between Defendant Samsung and Defendant Cheil, but instead refers to them collectively as Cheil/Samsung. For purposes of this motion, the court adopts Dealers' collective reference to the defendants where necessary to conform to the pleadings.

**2.** In considering the motion currently before it, the court must construe the facts in the light most favorable to Plaintiff. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994).

North Carolina, South Carolina, Virginia, West Virginia, and parts of Tennessee, Ohio, and Pennsylvania.

Subsequent to the initial meeting and agreement of the parties, Dealers inquired of Mr. Chun about executing a written contract to formalize the parties' agreement. Mr. Chun responded to Dealers that "Cheil/Samsung did not use written agreements because it [sic] believed that Cheil/Samsung were partners with their distributors and did not need a distributorship contract." (Compl. ¶ 11.) Nevertheless, Mr. Chun eventually supplied Dealers with a sample written agreement that Defendants had entered into with their West Coast distributor. Dealers made several proposed changes to the sample distributorship agreement and returned the proposed agreement to Mr. Chun. There are no allegations that either Mr. Chun or anyone else at Cheil/Samsung responded to the proposed agreement.

The parties held a second meeting at Dealers' office after the proposed agreement had been circulated by Dealers. A Mr. Choi, head of U.S. operations for Cheil/Samsung, was among those present for Defendants. After the parties discussed their relationship, Dealers requested that Defendants sign the written distributorship agreement, a copy of which was on the table in front of Mr. Choi. Mr. Choi responded that he had read the proposed agreement but that the agreement did not need to be signed. Mr. Choi continued by stating that in Korea, "we do it by handshake." (Id. ¶ 13.) At that point, Mr. Choi and Russell Barringer, chairman of the board of directors of Dealers, stood up and shook hands. No written agreement was ever signed by the parties.

In or around September 2000, Dealers placed its first Staron orders with Cheil/Samsung and began to market Staron. Plaintiff made a considerable marketing investment, including hiring additional employees, incurring marketing expenses, and maintaining Staron inventory. However, from the very beginning, the parties' relationship was tenuous. Dealers had difficulty obtaining sufficient inventory and samples of the Staron product from Defendants, which limited its marketing effectiveness. Additionally, although the parties had orally agreed that the first three years of the distributor relationship would be used as a sales pattern for purposes of establishing sales goals, beginning in 2002, Cheil/Samsung set and aggressively increased Dealers' minimum sales levels while reducing its sales territory.[3]

Dealers initially protested the sales goal increases and territory reductions but eventually accepted Cheil/Samsung's requirements and continued to aggressively market the Staron product. Despite its best efforts, Dealers did not meet any of Defendants' sales goals. In April 2003, without advance notice, Cheil/Samsung informed Dealers that the distributorship agreement was terminated. Dealers' entire sales territory was immediately given to a new distributor in Charlotte, North Carolina. The sudden termination of the distributorship agreement, with more than four years remaining, left Dealers with substantial inventory of Staron, an oversized sales and marketing staff, and potential future warranty claims.

Dealers brought suit against Defendants in the Superior Court of the State of North Carolina, Durham County. Defen-

---

3. For the years 2002 and 2003, Cheil/Samsung increased Dealers' sales goals by approximately 20% and 75%, respectively, over the prior years while reducing Plaintiff's sales territory. Cheil/Samsung also increased Dealers' 2003 sales goal mid-year in March 2003 by 280%, despite Dealers' problems meeting the original sales goal and Cheil/Samsung's intention to remove South Carolina from Dealers' territory.

dants removed the suit to this court. Now before the court is Defendants' Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim Upon Which Relief Can Be Granted Pursuant to Rule 12(b)(6).

## II. STANDARD OF REVIEW

A defendant's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("12(b)(6)") tests the legal sufficiency of the pleadings, but does not seek to resolve disputes surrounding the facts. *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). A court must determine only if the challenged pleading fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The issue is not whether the plaintiff will ultimately prevail on his claim, but whether he is entitled to offer evidence to support the claim. *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989). A pleading "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The pleading must be liberally construed in the light most favorable to the non-moving party and allegations made therein are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969).

## III. ANALYSIS

### A. Breach of Distributorship Agreement

█ Plaintiff alleges in Count I of its complaint that Defendants materially breached the oral distributorship agreement by terminating it in April 2003, over four years before its agreed-upon expiration. As a result of Defendants' breach, Plaintiff alleges it was denied the profits of its Staron marketing venture while incurring substantial marketing expenses. Defendants argue Plaintiff's complaint fails to state a claim because the oral agreement is barred by the statute of frauds.[4] (Defs.' Mem. Supp. Mot. Dismiss at 6–7.)

Defendants properly draw the court's attention to Chapter 75 of the North Carolina General Statutes ("Chapter 75") on monopolies, trusts, and consumer protection and its statute of frauds. *See* N.C. Gen.Stat. § 75–4. The statute of frauds for restraints on trade provides that "[n]o contract or agreement hereafter made, limiting the rights of any person to do business anywhere in the State of North Carolina shall be enforceable unless such agreement is in writing duly signed by the party who agrees not to enter into any such business within such territory." *Id.* The North Carolina Supreme Court has applied this statute to distributorship agreements, holding that "a contract whereby a person, firm or corporation is made exclusive distributor for the State of North Carolina, precluding the manufacturer from doing business in North Carolina otherwise than through this single channel, is void unless the party so limited or restricted agrees thereto in writing." *Radio Elecs. Co. v. Radio Corp. of America,* 244 N.C. 114, 117, 92 S.E.2d 664, 666 (1956). As Dealers' complaint alleges it was orally given exclusive rights to pur-

---

4. *Defendants also argue that, even if the agreement is enforceable, Defendants did not breach the agreement because it was terminable at will by either party. However, Dealers' complaint alleges the parties orally agreed to a seven-year term. (Compl.¶ 10.) Because* the court must take all allegations of fact in the complaint as true for purposes of a Rule 12(b)(6) motion, *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969), *Defendants' argument must fail.*

chase and sell Staron within the state of North Carolina (Compl.¶ 10), Defendants correctly conclude the oral distributorship agreement between the parties is unenforceable under the statute. *See Radio Elecs.*, 244 N.C. at 117, 92 S.E.2d at 666 (barring oral distributorship agreement because of N.C. Gen.Stat. § 75–4; *Norlin Indus., Inc. v. Music Arts, Inc.*, 67 N.C.App. 300, 304–05, 313 S.E.2d 166, 169 (1984)) (barring oral franchise agreement under same statute).

Plaintiff admits there was no signed agreement as required by the statute of frauds, but nonetheless argues Defendants have waived their right to assert the statute of frauds or, in the alternative, are barred from asserting the defense based on the doctrine of promissory estoppel.

### 1. Waiver

■ Plaintiff argues Defendants waived their right to a written contract by indicating the written document did not have to be signed because, in Korea, the "[Defendants] do it by handshake." (Compl.¶ 13.) Plaintiff relies on general contract waiver principles to argue that the "doctrine of waiver in proper cases is now as firmly established as the doctrine of the rigidity and inflexibility of the written word." *H.M. Wade Mfg. Co. v. Lefkowitz*, 204 N.C. 449, 168 S.E. 517, 519 (1933). While that may be the case for specific terms of a written contract, Plaintiff points to no cases in North Carolina or any other state whereby a court has recognized waiver of a writing in its entirety.

Plaintiff instead bases its argument almost entirely on *Varnell v. Henry M. Milgrom, Inc.*, 78 N.C.App. 451, 337 S.E.2d 616 (1985). In *Varnell*, a peanut farmer brought an action against the buyer of his peanuts for breach of an alleged oral modification to the underlying written purchase contract. *Id.* at 452, 337 S.E.2d at 617.

The plaintiff farmer alleged a subsequent oral agreement changed the price and quantity terms of the original contract. *Id.* at 454, 337 S.E.2d at 618. The trial court found that oral modification of the contract was barred by the statute of frauds contained in the Uniform Commercial Code ("UCC"), N.C. Gen.Stat. 25–2–209. *Id.* at 453, 337 S.E.2d at 617. On appeal, the plaintiff farmer argued the statute of frauds did not apply, but if it did, the defendant buyer waived the defense. *Id.* The North Carolina Court of Appeals discussed waiver, analyzed decisions of other jurisdictions, and concluded there were no facts that would support plaintiff's claim of an oral waiver. *Id.* at 457, 337 S.E.2d at 620. Plaintiff's argument here, in essence, is that because the *Varnell* court considered whether oral modification of a written contract could waive the UCC statute of frauds, this court should likewise consider waiver of N.C. Gen.Stat. § 75–4.

Plaintiff, however, misapplies *Varnell* for several reasons. First, *Varnell* dealt with an alleged oral modification to a written contract, whereas here there is no written contract at all. The *Varnell* court explained that if the alleged oral agreement were a novation or substitute contract, then the UCC statute of frauds would operate to bar it. *See id.* at 454, 337 S.E.2d at 618 ("As a new contract, it must satisfy all the normal requisites of contractual validity including the Statute of Frauds."). Second, the legal issue in *Varnell* is not analogous. The UCC, at issue in *Varnell*, contains a separate section on waiver, which itself references the UCC statute of frauds. *See* N.C. Gen.Stat. § 25–2–209(4) ("Although an attempt at modification ... does not satisfy the [statute of frauds] it can operate as a waiver."). Although rejected by the court, the plaintiff in *Varnell* argued the UCC itself rec-

ognized the possibility of waiving the statute of frauds. *See Varnell,* 78 N.C.App. at 455, 337 S.E.2d at 619 (referring to the UCC waiver provision and holding that it is "reasonable to conclude that 'waiver' is employed with reference to the terms of the contract, not the Statute of Frauds."). In this case, there is no such waiver provision attached to Chapter 75's statute of frauds on which Plaintiff can rely. *See* N.C. Gen.Stat. § 75-4. Therefore, there is no reason to believe waiver is possible here. Lastly, the very policies behind the UCC and Chapter 75 differ dramatically. Chapter 75, as opposed to the UCC, is a consumer protection statute with a strong underlying public policy justification. *See, e.g., Johnson v. Phoenix Mut. Life Ins. Co.,* 300 N.C. 247, 263, 266 S.E.2d 610, 621 (stating that a practice is unfair if it offends established public policy or is substantially injurious to consumers), *rev'd on other grounds,* 300 N.C. 247, 266 S.E.2d 610 (1980); *Rose v. Vulcan Materials Co.,* 282 N.C. 643, 656, 194 S.E.2d 521, 531 (1973) (commenting that the common law forerunner to Chapter 75 outlawed restraints of trade so as not to interfere with the interests of the public). Waiver only applies where it is not forbidden by law or public policy, *Wachovia Bank & Trust Co., N.A. v. Rubish,* 306 N.C. 417, 425, 293 S.E.2d 749, 754. Therefore, because Chapter 75, including its statute of frauds, is a public policy consumer protection statute, waiver does not apply.

Therefore, because 75-4's language is "clear and unambiguous," *Manpower of Guilford County, Inc. v. Hedgecock,* 42 N.C.App. 515, 519, 257 S.E.2d 109, 113 (1979), and Plaintiff has given the court no persuasive reason for detouring from the "consistent legislative policy that business contracts be in writing," *Varnell,* 78 N.C.App. at 455, 337 S.E.2d at 619, the court holds that Defendants did not waive the applicable statute of frauds.

## 2. Promissory Estoppel

In the alternative to a claim of waiver, Plaintiff argues this court should exercise its equitable power and rule that promissory estoppel bars Defendants from raising their statute of frauds defense. In support, Plaintiff contends courts applying North Carolina law have used promissory estoppel to block the application of the statute of frauds where there was detrimental reliance on an oral contract between the parties. (Pl.'s Br. Opp'n Defs.' Mot. Dismiss at 10.)

There are two differing uses of promissory estoppel. The first, an extension of traditional equitable estoppel, applies where there is a "promise or representation as to an intended abandonment by the promisor of a legal right which he holds or will hold against the promisee." *Home Elec. Co. of Lenoir, Inc. v. Hall and Underdown Heating and Air Conditioning Co.,* 86 N.C.App. 540, 543, 358 S.E.2d 539, 541 (1987). This use is considered defensive and North Carolina courts have applied promissory estoppel in limited situations. *See, e.g., Brooks v. Hackney,* 329 N.C. 166, 173-74, 404 S.E.2d 854, 859 (1991) (holding that plaintiff was estopped from denying the validity of an executed land sales agreement because he drafted the agreement and the defendant relied upon it to his detriment); *Rubish,* 306 N.C. at 429-31, 293 S.E.2d at 757-59 (1982) (holding that defendant tenant could assert promissory estoppel as defense to summary judgment because plaintiff landlord had waived lease term).

By contrast, a number of jurisdictions recognize a broader affirmative or offensive use that originates from the Second Restatement of Contracts:

A promise which the promisor should reasonably expect to induce action or

forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Restatement (Second) of Contracts § 90 (1979). This broader view of promissory estoppel can be used to supply a missing element to a contract, giving the promisee an enforceable right of action in contract against the promisor. *See* 56 A.L.R.3d 1037 § 2(a) (1974). Affirmative use occurs when a promisee attempts to create a contract which would not exist without the application of promissory estoppel. *Id.* Courts have used this broader view of promissory estoppel to dispense with the requirement of a writing under certain circumstances. *See id.*

The Fourth Circuit Court of Appeals, applying as a matter of first impression "what [they] perceive[d] to be the law that North Carolina courts would apply," initially recognized affirmative use of promissory estoppel in *Allen M. Campbell Co., General Contractors, Inc. v. Virginia Metal Industries, Inc.,* 708 F.2d 930, 934 (4th Cir.1983). Four years later, however, the North Carolina Court of Appeals rejected such affirmative use. *See Home Elec.,* 86 N.C.App. at 544–45, 358 S.E.2d at 542 (1987) (stating that "the doctrine has only been permitted in North Carolina for defensive relief" and that "*Campbell* ... is not binding precedent on North Carolina Courts").

In the instant case, the proposed use for promissory estoppel is offensive in nature. Here, reducing the oral agreement to writing is not a "right" that Defendants have the ability to abandon so as to make Plaintiff's request for promissory estoppel defensive in nature. Instead, a writing is a requirement of law. *See* N.C. Gen.Stat. § 75–4. In this case, Plaintiff relies on promissory estoppel to fill in a missing element of its breach of distributorship claim, the writing itself. Without promissory estoppel, Plaintiff cannot bring its claim for breach of the distributorship. Although Plaintiff's proposed affirmative use is the very same as the use the North Carolina Court of Appeals rejected in *Home Electric,* Plaintiff would have this court follow the treacherous path of *Campbell.*

The safer path is that of *Rice v. Vitalink Pharmacy Services,* 124 F.Supp.2d 343 (W.D.N.C.2000). There, a commercial developer asserted promissory estoppel to prove breach of an oral lease agreement by a prospective tenant that had stated "the deal is a go." *Id.* at 345–46. The district court rejected the developer's affirmative use of promissory estoppel, declining to "accept the Plaintiff's invitation to adopt the reasoning of *Campbell* in favor of the clear controlling law of North Carolina." *Id.* at 346. This court similarly declines to accept Plaintiff's invitation to apply promissory estoppel affirmatively. To do so would be error. Instead, the court holds that Defendants are not estopped from asserting the statute of frauds.

Therefore, because Chapter 75's statute of frauds applies to the parties' oral distributorship agreement, Defendants did not waive the writing requirement, and Defendants are not estopped from raising their statute of frauds defense, the court will grant summary judgment in favor of Defendants with regard to Plaintiff's claim for breach of the distributorship agreement.

**B. Breach of Partnership Agreement**

█ In Count IV of the complaint, Plaintiff pleads breach of a de facto partnership as an alternative to its claim for breach of distributorship agreement. (Pl.'s Br. Opp'n Defs.' Mot. Dismiss at 18.)

Plaintiff acknowledges the parties intended to enter into a distributor relationship, but urges the court to find a partnership because of Mr. Chun's statement that "Cheil/Samsung did not use written agreements because it [sic] believed that Cheil/Samsung were partners with their distributors and did not need a distributorship contract."[5] (Compl.¶ 11.) Defendants argue that Plaintiff does not and cannot allege sufficient facts to establish a partnership relationship. (Defs.' Mem. Supp. Mot. Dismiss at 10.)

The Uniform Partnership Act defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." N.C. Gen. Stat. § 59–36. A partnership is also described as:

a combination of two or more persons of their property, effects, labor, or skill in a common business or venture, under an agreement to share the profits or losses in equal or specified proportions, and constituting each member as an agent of the others in matters appertaining to the partnership and within the scope of its business.

*Zickgraf Hardwood Co. v. Seay,* 60 N.C.App. 128, 133, 298 S.E.2d 208, 211 (1982). To prove the existence of a partnership, an express agreement is not required; the intent of the parties can be inferred by their conduct and an examination of all the facts and circumstances. *Wike v. Wike,* 115 N.C.App. 139, 141, 445 S.E.2d 406, 407 (1994). The parties do not even have to know that their actions will have the effect of creating a partnership, that a partnership has been created, or that they have become partners. *In re Vannoy,* 176 B.R. 758, 765 (Bankr. M.D.N.C.1994). However, the facts and circumstances must justify the inference of a partnership. *Eggleston v. Eggleston,* 228 N.C. 668, 674, 47 S.E.2d 243, 247 (1948). Co-ownership and sharing of any actual profits are indispensable requisites for a partnership. *Wilder v. Hobson,* 101 N.C.App. 199, 202, 398 S.E.2d 625, 627 (1990). Holding an association out to the public as a partnership, the contributions of capital and state licensing are factors which show a partnership exists. *See Compton v. Kirby,* 157 N.C.App. 1, 11–14, 577 S.E.2d 905, 912–14 (2003). Similarly, filing partnership tax returns and establishing partnership bank accounts also are important factors. *Vannoy,* 176 B.R. at 765–67.

After reviewing all the facts and circumstances in the complaint and considering them in the light most favorable to Plaintiff, Plaintiff has alleged no set of facts in support of its claim for a partnership agreement which would entitle it to relief.

**5.** Plaintiff also urges the court to review the terms of the proposed written distributorship agreement, attached to Plaintiff's complaint, to find indices of a partnership. (Pl.'s Br. Opp'n Defs.' Mot. Dismiss at 19.) However, Plaintiff never alleges this draft agreement was created as a result of collaboration between the parties. Instead, the complaint shows Defendants sent Plaintiff a sample agreement that Defendants had with their West Coast distributor. (Compl.¶ 11.) Upon receiving the sample agreement, Plaintiff proposed changes to the agreement and returned it to Defendants. (*Id.* ¶ 12.) Plaintiff alleges that Defendants neither accepted the terms contained in the draft agreement nor suggested any changes. Rather, Plaintiff alleges only that it re-introduced the draft agreement at the final meeting of the parties. (*Id.* ¶ 13.) The agreement was never signed. Plaintiff's factual allegations, therefore, show nothing more than Plaintiff's intent and state of mind; they do not show Defendants' agreement to the terms contained in the unsigned distributorship agreement. Because Plaintiff does not allege the written agreement was a reduction of the terms agreed to orally by the parties, the draft agreement cannot serve as evidence of the parties' agreement for purposes of this motion.

The complaint does not allege either of the "indispensable requisites for a partnership"—a sharing of the profits or co-ownership between the parties. Nor does the complaint allege any of the other factors courts have recognized as indices of partnership. Instead, there is but a single allegation in the complaint which implicates a partnership agreement—the general statement that Defendants believed they were partners with their distributors. (Compl.¶ 11.) This general statement cannot create a legal partnership, for it is against the great weight of facts alleged by Plaintiff. Even if the court were to give legal meaning to this statement of opinion and camaraderie, the result would be a partnership not just between Plaintiff and Defendants, but consisting of Defendants and all their worldwide distributors. The court cannot stretch this allegation, even when considering it in the light most favorable to Plaintiff, to create a partnership by operation of law. Therefore, Plaintiff's claim for breach of partnership agreement will be dismissed.

### C. Negligent Misrepresentation

Plaintiff alleges in Count II of its complaint that Defendants negligently misrepresented that: (1) "no written agreement was needed between Cheil/Samsung and Dealers Supply and that a handshake was enough for Cheil/Samsung to make an agreement"; (2) the distributor relationship would last for seven years; (3) for the first three years, Defendants would not require Plaintiff to sell a minimum amount of Staron; and (4) after three years, the parties would mutually agree on yearly sales goals which would not increase each year by more than the industry standard growth for the prior year. (Compl.¶ 35.) Plaintiff further alleges Plaintiff relied upon these representations to its detriment. (*Id.* ¶ 36.) Defendants argue that dismissal of this claim is proper because Plaintiff has failed to plead its allegations with particularity under Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)").[6] (Defs.' Mem. Supp. Mot. Dismiss at 11.)

 Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). In construing Rule 9(b), courts require that a plaintiff plead the "time, place, and contents of the alleged fraudulent representation, as well as the identity of each person making the misrepresentation and what was obtained thereby." *Liner v. DiCresce*, 905 F.Supp. 280, 287 (M.D.N.C.1994) (quoting *Riley v. Murdock*, 828 F.Supp. 1215, 1225 (E.D.N.C. 1993)). Moreover, where there are multiple defendants, plaintiffs must allege all claims with particularity as to each defendant. *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 251 (D.Md.2000). The identity

---

6. Defendants also argue that Plaintiff's negligent misrepresentation claim should be dismissed for failure to state a claim upon which relief can be granted. (Defs.' Mem. Supp. Mot. Dismiss at 12–14.) The court will deny Defendants' motion under Rule 12(b)(6) as it applies to negligent misrepresentation pending Plaintiff's filing of an amended complaint, as discussed more thoroughly below. Defendants may renew their motion if Plaintiff's more specific claim for negligent misrepresentation fails to state a claim. All the same, based on the current pleadings before the court, the court has doubts as to how Plaintiff could have reasonably relied on any of Defendants' alleged misrepresentations, especially considering Plaintiff's knowledge of the importance of a signed writing. However, because the reasonableness of a plaintiff's reliance is typically "a question for the jury, unless the facts are so clear that they support only one conclusion," *State Properties, LLC v. Ray*, 155 N.C.App. 65, 73, 574 S.E.2d 180, 186 (2002), the court will not dismiss Plaintiff's claim on that ground at this time.

of the person making the misrepresentation is particularly important where there are multiple defendants:

> The identity of those making the misrepresentations is crucial. Courts have been quick to reject pleadings in which multiple defendants are 'lumped together' and in which 'no defendant can determine from the complaint which of the alleged representations it is specifically charged with having made, nor the identity of the individual by whom and to whom the statements were given.'

*McKee v. Pope Ballard Shepard & Fowle, Ltd.*, 604 F.Supp. 927, 931 (N.D.Ill.1985) (quoting *Lincoln Nat'l Bank v. Lampe*, 414 F.Supp. 1270, 1278 (N.D.Ill.1976)).

■ Rule 9(b) does not expressly refer to the tort of negligent misrepresentation. In North Carolina, however, negligent misrepresentation is closely akin to fraud, differing primarily in the requisite state of mind of the purported actor. *Breeden v. Richmond Cmty. College*, 171 F.R.D. 189, 202 n. 14 (M.D.N.C.1997). Whereas fraud requires proof of a false representation that was made with the intent to deceive, *Liner v. DiCresce*, 905 F.Supp. at 288 (citing *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988)), the tort of negligent misrepresentation "occurs when in the course of a business or other transaction in which the individual has a pecuniary interest, he or she supplies false information for the guidance of others in a business transaction without exercising reasonable care in obtaining or communicating the information." *Rhodes, Inc. v. Morrow*, 937 F.Supp. 1202, 1215 (M.D.N.C. 1996) (quoting *Fulton v. Vickery*, 73 N.C.App. 382, 388, 326 S.E.2d 354, 358 (1985)). Therefore, like a claim for fraud or mistake, both covered under Rule 9(b), negligent misrepresentation is based upon some "confusion or delusion of a party

such as by some misrepresentation, omission, misapprehension or misunderstanding." *Breeden*, 171 F.R.D. at 203. Recognizing the kinship, some federal courts have extended Rule 9(b) to "all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." *Toner v. Allstate Ins. Co.*, 821 F.Supp. 276, 283 (D.Del.1993); *see, e.g., Pitten v. Jacobs*, 903 F.Supp. 937, 951 (D.S.C.1995) (holding that the gravamen of negligent misrepresentation is fraud). However, other courts have refused to extend Rule 9(b)'s coverage. *See, e.g., In re LILCO Sec. Litig.*, 625 F.Supp. 1500, 1504 (E.D.N.Y.1986).

■ This court adopts the approach that claims of negligent misrepresentation fall within the purview of Rule 9(b). In doing so, the court finds that the underlying rationales for requiring heightened pleading for fraud equally apply to negligent misrepresentation. *See Breeden*, 171 F.R.D. at 198–202 (analyzing the rationales of Rule 9(b), the history of particularized pleading, and the relationship between fraud and negligent misrepresentation; applying the heightened standard to negligent misrepresentation). Although this court has not located any controlling authority from the Fourth Circuit Court of Appeals on the issue, by adopting the Rule 9(b) standard in this case, it conforms our requirements to those of our sister courts within this circuit. *See, e.g., Giannaris v. Cheng*, 219 F.Supp.2d 687, 694 (D.Md. 2002); *Pitten v. Jacobs*, 903 F.Supp. at 951.

■ Applying the Rule 9(b) standard to Plaintiff's negligent misrepresentation claim, the claim fails for want of particularity. Plaintiff does not allege the time, place, or circumstances of the alleged misrepresentations. Nor does Plaintiff consistently identify the person making the

alleged misrepresentations. Additionally, Plaintiff has failed to distinguish between the actions of Cheil or its agents and of Samsung or its agents, but simply alleges that some representations were made by "Cheil/Samsung."

Notwithstanding the complaint's lack of particularity, the court holds that Plaintiff cannot be deemed to have notice of the heightened pleading requirement for negligent misrepresentation because of the lack of controlling authority in the Fourth Circuit. Therefore, the court will dismiss Plaintiff's negligent misrepresentation claim without prejudice, enabling Plaintiff to conform its claim to Rule 9(b). Such amended complaint must be filed within 20 days.

### D. Unfair and Deceptive Trade Practices

Plaintiff alleges in Count III of its complaint that Defendants' conduct under the oral distributorship and Defendants' subsequent termination of Plaintiff are unfair, deceitful, coercive, and deceptive, in violation of N.C. Gen.Stat. § 75–1.1 ("Section 75–1.1"). In particular, Plaintiff argues that Defendants arbitrarily set unreasonable goals and demands upon Plaintiff in a blatant attempt to make Plaintiff quit, "thereby shielding Cheil/Samsung of the dangers of terminat[ion]." (Pl.'s Br. Opp'n Defs.' Mot. Dismiss at 17.)

Defendants' argument, in essence, is that Plaintiff fails to state a claim under Section 75–1.1 because there is no contract between the parties after application of the statute of frauds. Defendants argue that absent a binding distributorship agreement, the parties were left with either arms-length negotiations or an at-will relationship. (Defs.' Mem. Supp. Mot. Dismiss at 14–15.) Advancing this theory, Defendants rely on *Big Red, LLC v. Davines S.P.A.*, No. 01–1254, 2002 WL 440229 (4th Cir. Mar.21, 2002), for the proposition that statements made during arms-length negotiations do not give rise to liability under Section 75–1.1. Similarly, Defendants argue that the termination of an at-will relationship also does not raise liability under *Tar Heel Industries, Inc. v. E.I. duPont de Nemours & Co.*, 91 N.C.App. 51, 370 S.E.2d 449 (1988).

 Defendants overemphasize the importance of the parties' contractual relationship in their Section 75–1.1 analysis. To state a claim for unfair and deceptive trade practices a plaintiff must show: "(1) that the defendant committed an unfair or deceptive act or practice, or an unfair method of competition; (2) in or affecting commerce; (3) which proximately cause[d] actual injury to plaintiff." *Furr v. Fonville Morisey Realty, Inc.*, 130 N.C.App. 541, 551, 503 S.E.2d 401, 408 (1998) (quoting *Spartan Leasing v. Pollard*, 101 N.C.App. 450, 460–61, 400 S.E.2d 476, 482 (1991)). Whether a particular act is unfair or deceptive, depends on the facts surrounding the transaction and the impact on the marketplace. *Concrete Serv. Corp. v. Investors Group, Inc.*, 79 N.C.App. 678, 685, 340 S.E.2d 755, 760 (1986). The presence of an enforceable contract is but one of the "facts surrounding the transaction." Thus, on the one hand, a mere breach of contract does not give rise to a claim under Section 75–1.1. *See Branch Banking and Trust Co. v. Thompson*, 107 N.C.App. 53, 62, 418 S.E.2d 694, 700 (1992); *see also South Atlantic Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 536 (4th Cir.2002) (holding that a breach of contract must be particularly egregious to permit recovery under Section 75–1.1). On the other hand, however, neither the statutory language itself nor North Carolina case law requires proof of any contractual relationship be-

tween the parties.[7] *See Prince v. Wright*, 141 N.C.App. 262, 268, 541 S.E.2d 191, 196 (2000) (noting that although unfair and deceptive practices tend to involve buyer-seller relationships, "courts have also recognized actions based on other types of commercial relationships, including those outside of contract"). Thus, the proper test under Section 75–1.1 is not whether the parties had an enforceable contract, but rather whether the allegedly unfair practice "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."[8] *Johnson v. Phoenix Mut. Life Insurance Co.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980) *overruled on other grounds, Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385 (1988). That decision is a question of law for the court. *Gray v. North Carolina Ins. Underwriting Ass'n*, N.C. 352 N.C. 61, 529 S.E.2d 676 (2000).

 Careful review of North Carolina precedent supports the court's conclusion that the existence of a contractual relationship between the parties does not control whether there is a Section 75–1.1 claim.[9] In

---

7. Not only is the requirement of a contractual relationship absent from the statutory text, but N.C. Gen.Stat. § 75–1.1 creates an independent cause of action that was specifically designed to provide relief in situations where "common law remedies had proved often ineffective." *Marshall v. Miller*, 302 N.C. 539, 543, 547, 276 S.E.2d 397, 400, 402 (N.C.) (rejecting the notion that recovery under Chapter 75 is limited "to cases where some recovery at common law would probably also lie"). Additionally, traditional common law defenses such as contributory negligence or good faith are not relevant to Section 75–1.1 claims. *Concrete Serv. Corp. v. Investors Group, Inc.*, 79 N.C.App. 678, 685, 340 S.E.2d 755, 760 (1986).

8. The thrust of Plaintiff's Section 75–1.1 claim is that Defendants' conduct under the oral distributorship and the circumstances surrounding Plaintiff's termination constituted an unfair trade practice. (*See* Pl.'s Br. Opp'n Defs.' Mot. Dismiss at 10.) Once Plaintiff pleads its negligent misrepresentation claim with particularity, however, that claim may provide an additional theory of liability as a deceptive trade practice under Section 75–1.1. *See Powell v. Wold*, 88 N.C.App. 61, 362 S.E.2d 796 (1987) (holding that the complaint for fraud and negligent misrepresentation was sufficient to constitute a deceptive trade practice). The test for deceptiveness is whether the act "possesse[s] the tendency or capacity to mislead, or create[s] the likelihood of deception." *Compton v. Kirby*, 157 N.C.App. 1, 20, 577 S.E.2d 905, 917 (2003).

9. In 2002, the Fourth Circuit Court of Appeals, applying North Carolina law, seems to have come to a similar conclusion. In *South Atlantic Limited Partnership of Tennessee, LP v. Riese*, 284 F.3d 518 (4th Cir.2002), the court was required to determine whether the expulsion of a partner in a limited partnership, which deprived the partner of considerable earned compensation but was not a breach of the partnership agreement, was sufficiently unfair or deceptive in nature under Chapter 75. *Id.* at 539. The Fourth Circuit recognized there was no precedent that "hold[s] that the exercise of a contractual right is necessarily outside the bounds of a general [Chapter 75] analysis." *Id.* It continued, stating that "[a]lthough it may be rare that the exercise of a contractual right will meet this stringent standard, it is possible for such an exercise, when it involves egregious and aggravating conduct, to constitute an unfair or deceptive trade practice under [Chapter 75]." *Id.* The court concluded that "equity nevertheless compels the conclusion that the expulsion of the [partner] from [the partnership] in these circumstances constituted an unfair trade practice." *Id.* at 540. What follows from *Riese* is that if an unfair or deceptive trade practice can arise from conduct that falls short of a breach of contract, surely the contractual status of the parties is not a controlling factor. *See Big Red, LLC v. Davines S.P.A.*, No. 01–1254, 2002 WL 440229, at *8 n. 3 (4th Cir. Mar.21, 2002) ("Lest there be any confusion, we do not hold that an enforceable agreement is a prerequisite to or an element of a claim under N.C. Gen.Stat. § 75–1.1.").

*Process Components, Inc. v. Baltimore Aircoil Co.*, 89 N.C.App. 649, 366 S.E.2d 907 (1988), the defendant manufacturer of hydraulic pumps, Baltimore Aircoil Company, Inc. ("BAC"), had grown dissatisfied with its distributor. BAC orally promised the plaintiff, Process Components, Inc. ("PROCOM"), an exclusive distributorship after telling PROCOM that BAC's current distributor had been terminated in the industrial market. *Id.* at 650, 366 S.E.2d at 909. Based on BAC's promises, PROCOM leased a warehouse, began obtaining sales leads, and held itself out as a BAC distributor. *Id.* The parties later signed a written contract. After PROCOM complained that BAC's prior distributor continued to contact some industrial clients, BAC terminated its distributorship with PROCOM. *Id.* BAC explained it was still bound to its prior distributor because of a written agreement, thus preventing PROCOM from having the promised exclusive distributorship rights. The North Carolina Court of Appeals held, without mentioning or even eluding to the existence of a contract, that BAC's "misrepresentations clearly support[ ] the court's conclusion that [BAC's] unfair or deceptive acts or practices caused injury to [PROCOM]." *Id.* at 655, 366 S.E.2d at 911. In fact, the existence of an enforceable contract appears irrelevant in *Process Components* because the contract was created after the events underlying the plaintiff's Section 75–1.1 claim—the defendant's misrepresentations and the plaintiff's reliance on them. *See id.* at 652–53, 366 S.E.2d at 910.

Three years later, in *Custom Molders, Inc. v. Roper Corp.*, 101 N.C.App. 606, 401 S.E.2d 96 (1991), the same court again recognized the actions of the defendant, not the relationship between the parties, is the thrust of a Section 75–1.1 claim. There, the plaintiff plastic parts manufacturer, Custom Molders, entered into an oral requirements contract for lawn mower foot pads with defendant Roper Corporation, a manufacturer of riding lawn mowers. *Id.* at 609, 401 S.E.2d at 97. The contract was to last so long as Custom Molders timely delivered good quality foot pads to Roper and met the price of competitors after receiving notice of lower bids. *Id.* After more than a year, Roper terminated the agreement and began buying pads from another supplier at a lower price without giving Custom Molders an opportunity to meet the lower bid. *Id.* Roper argued, on appeal of the trial court's judgment entered against it, there was not a valid agreement between the parties because the requirements contract was not in writing and the relationship of the parties foreclosed Section 75–1.1 liability. *See id.* at 614, 401 S.E.2d at 100. The appellate court found the requirements contract did not need to be in writing because the pads were custom made for Roper and could not be sold to anyone else. *Id.* The court, however, downplayed the relationship of the parties as controlling in a Chapter 75 claim, stating "[Roper's] arguments for the most part do not address the real issue presented.... the [trial court's] judgment is based upon deceit which is universally regarded as an unfair and deceptive trade practice." *Id.* The court upheld Custom Molders' Section 75–1.1 claim, finding that the "[d]efendant's deceit in this case, as found by the jury, was just as unfair and deceptive as that of the defendant in [*Process Components*]." *Id.*

In 1996, the North Carolina Court of Appeals rejected liability under Chapter 75 in *Computer Decisions, Inc. v. Rouse Office Management of North Carolina, Inc.*, 124 N.C.App. 383, 477 S.E.2d 262 (1996). In that case, the plaintiff, Computer Decisions, Inc. ("CDI"), began negotiating a lease for office space with the defendant

Rouse–Teachers Gateway II Limited Partnership and its property manager, Rouse Office Management of North Carolina, Inc. (jointly, "Rouse"). *Id.* at 385, 477 S.E.2d at 263. The parties reached a verbal agreement on some of the terms, including the lease period, premises, upfitting charges, and rent, but certain other terms remained undecided. *Id.* at 385, 477 S.E.2d at 264. After the parties came to their initial verbal agreement, CDI's president asked Rouse's vice president if they had a deal, to which Rouse's vice president responded, "We have a deal." *Id.* At the time of the agreement, Rouse knew CDI had a deadline for moving out of its current space. The parties continued to negotiate the remaining terms of the lease for the next six weeks until Rouse informed CDI it had decided to lease the office space to another tenant. *Id.* at 386, 477 S.E.2d at 264. At that point, CDI had only 30 days left on its current lease in which to locate, lease, remodel, and move into new office space. *Id.* CDI brought suit, alleging among other claims, a Section 75–1.1 claim based on Rouse's alleged breach of the oral lease agreement. On appeal, the North Carolina Court of Appeals held that CDI's breach of lease claim was barred by the statute of frauds and that Rouse's actions did not violate Chapter 75. *Id.* at 388, 390, 477 S.E.2d at 265, 266. The court, however, did not reject. CDI's Chapter 75 claim because of the absence of an enforceable contract. Instead, the court analyzed Rouse's actions to determine if they constituted substantial aggravating circumstances attendant to the breach of the (unenforceable) oral lease. *Id.* at 390, 477 S.E.2d at 266. The court concluded CDI had not shown there were substantial aggravating circumstances attendant to the breach and affirmed the trial court's order granting summary judgment to Rouse. *Id.*

The distinction between these cases lies, not in the contractual relationship between the parties, but the extent of the deceptions practiced by each defendant. In *Process Components,* the jury found the defendant falsely represented certain crucial, inducing facts, including that the prior distributor had been terminated and that the plaintiff was the new exclusive distributor. 89 N.C.App. at 652–53, 366 S.E.2d at 910. In *Custom Molders,* the actions of the defendant in "secretly transferr[ing] the business to a competing supplier" and telling "plaintiff that it would have to reduce its prices if it was to keep the business" was found to be "just as unfair and deceptive" as that of the defendant in *Process Components.* 101 N.C.App. at 613, 401 S.E.2d at 100. By comparison, the court in *Computer Decisions* held that the defendant did not take comparable actions constituting "substantial aggravating circumstances," but instead the defendant's actions constituted a "mere breach of contract." 124 N.C.App. at 390, 477 S.E.2d at 266.

■ In light of the foregoing, the real issue here is whether Plaintiff's complaint alleges unfair and deceptive practices closer to those recognized in *Process Components* and *Custom Molders* or those rejected in *Computer Decisions.* The court finds that Dealers' allegations more closely resemble the former. Dealers alleges more than a mere breach of the unenforceable oral contract, as was alleged in *Computer Decisions.* Instead, similar to *Process Components,* Dealers alleges Defendants made false representations regarding their intent to enter into a binding distributorship agreement and the terms of that agreement. (Compl.¶¶ 10–11, 13–14.) Dealers further alleges these misrepresentations were intended to deceive and induce reliance and they resulted in injury to Dealers. (*Id.* ¶¶ 37–38.) Additionally,

similar to *Custom Molders*, Dealers alleges Defendants unreasonably raised sales goals and demands upon Dealers in violation of the oral agreement in order to make Dealers quit, while simultaneously secretly negotiating with another distributor to take over Dealers' distributorship. (*Id.* ¶¶ 16–24.) Therefore, because the alleged acts constituting unfair and deceptive acts more closely resemble *Process Components* and *Custom Molders*, Dealers has properly stated a claim for relief under Chapter 75. Defendants' motion to dismiss Dealers' Chapter 75 claim will be denied.

## IV. CONCLUSION

For the reasons stated herein,

IT IS ORDERED that Defendants' Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim Upon Which Relief Can Be Granted Pursuant to Rule 12(b)(6) [15] is **DENIED** in part and **GRANTED** in part. As to Counts I (breach of distributorship agreement) and IV (breach of partnership agreement), Defendants' motion is **GRANTED**. As to Count II (negligent misrepresentation), Defendants' motion is **GRANTED WITHOUT PREJUDICE**, enabling Plaintiff to file an amended complaint conforming to Rule 9(b) within 20 days. As to Count III (unfair and deceptive trade practices), Defendants' motion to dismiss is **DENIED**.

Plaintiff's Motion for Entry of Default [10] has been rendered moot by the filing of Defendants' motion to dismiss.