LeCann v. Cobham, 2012 NCBC 56.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
10 CVS 11169

NICOLE LECANN, DDS, Individually and
Derivatively,
          Plaintiff

        v.

SHARON J. COBHAM, DDS, et al.,
          Defendants/
          Third-Party Plaintiffs

        v.

CHL II, LLC, et al.,
          Third-Party Defendants[1]

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**JUDGMENT**

THIS CIVIL ACTION comes before the court for entry of Judgment, and

THE PARTIES having stipulated to this matter being tried non-jury and in the

North Carolina Business Court, at 225 Hillsborough Street, Raleigh, NC 27603, this

case thereafter was called for trial on August 15, 2011. At the close of Plaintiff's

evidence, the court directed verdict in favor of Defendant upon Plaintiff's claim for

Tortious Interference with Contracts and Prospective Economic Advantage (Counts V

and VI of the Complaint), pursuant to Rule 50, North Carolina Rules of Civil Procedure

("Rule(s)"). Thereafter, at the close of all the evidence the court denied all subsequent

Rule 50 motions. The court directed the parties to submit their closing arguments in the

form of post-trial briefs.

---

[1] The third-party claims and related cross-claims were voluntarily dismissed by stipulation dated July 19, 2011, and filed July 27, 2011, and are not relevant to this Judgment.

FINDINGS OF FACT

THE COURT, having heard and reviewed the evidence of record and arguments of counsel, makes the following FINDINGS of FACT:

[1]     Plaintiff Nicole LeCann, DDS ("LeCann") and Defendant/Third-Party Plaintiff Sharon J. Cobham, DDS ("Cobham") were both licensed dentists. They were classmates at the University of North Carolina School of Dentistry and graduated in 1999. They were close friends at that time, and the next year they decided to go into business together as professional colleagues and co-managers of several jointly-owned dental practices.

[2]     At times material to this civil action, LeCann and Cobham were joint and equal owners of several dental practices (collectively, "Joint Entities") and three limited liability companies located in North Carolina (collectively, "Real Estate Companies").[2]

[3]     The Joint Entities were: SHARON COBHAM, D.D.S. & NICOLE LECANN, D.D.S. IV, P.A. (a/k/a NORTH HILLS FAMILY DENTAL CARE) ("North Hills Practice"); SHARON COBHAM, D.D.S. & NICOLE LECANN, D.D.S. V, P.A. (a/k/a DURHAM FAMILY DENTAL CARE) ("Durham Practice"); SHARON J. COBHAM, D.D.S. & NICOLE LECANN, D.D.S., P.A. (a/k/a ANNE ELIZABETH FAMILY DENTAL CARE) ("Burlington Practice"); SHARON JOVANNA COBHAM, D.D.S. & NICOLE LECANN, D.D.S. & ASSOCIATES, P.A. (a/k/a APEX FAMILY DENTAL CARE) ("Apex Practice") and SHARON COBHAM, D.D.S. AND NICOLE LECANN, D.D.S. II, P.A. (a/k/a WINSTON-SALEM II) ("Winston-Salem II Practice").[3] The Joint Entities were North

_____

[2] Compl. ¶ 3.
[3] *Id.*

Carolina professional corporations formed pursuant to N.C. Gen. Stat. Chapter 55B (hereinafter, references to the North Carolina General Statutes will be to "G.S.").

[4] The Real Estate Companies were: CHL II, LLC ("CHL"); MHP III, LLC ("MHP") and SCNL, LLC ("SCNL").[4] The Real Estate Companies were formed and operated as limited liability companies, pursuant to G.S. Chapter 57C, for the purpose of owning real estate to be occupied by the Joint Entities. CHL owned the office condominiums where the North Hills Practice was located, SCNL owned a vacant lot in Apex where the parties planned to build an office and MHP owned the office condominium where the Apex Practice was located.

[5] Cobham also was the sole owner of Sharon Jovanna Cobham, D.D.S., P.A. ("Winston-Salem I Practice"), a dental practice in Winston-Salem, North Carolina.

[6] LeCann and Cobham were the only two officers, directors and shareholders/owners of the Joint Entities.[5] The practice and agreement between LeCann and Cobham was to manage the Joint Entities together through an informal arrangement they commonly referred to as "corporate," "Cobham & LeCann, Inc.," "C&L," "wemakencsmile.com" and other similar designations (collectively, "Arrangement"). The Arrangement allowed LeCann and Cobham to direct resources of the Joint Entities towards accounting, recruiting, cash management, acquisitions and expansions, planning and market assessments, among other activities.

[7] Cobham served as president of the Joint Entities and was responsible for the overall direction and leadership of the Joint Entities, while LeCann managed the details. Accordingly, Cobham exercised the power to transfer money, hire and fire

---

[4] *Id.*
[5] *Id.* ¶ 8.

personnel, pursue expansion concepts and perform other management decisions. LeCann assumed the primary responsibility for daily accounting, reimbursements for services rendered (including insurance and Medicaid compliance and collections) and other details of daily operations.

[8]    LeCann and Cobham also divided day-to-day operational responsibilities for the Joint Entities, with LeCann responsible for the Apex and North Hills Practices and Cobham responsible for the Durham, Burlington and Winston-Salem II Practices.

[9]    At times material, LeCann and Cobham were close companions and shared a personal friendship.  Until the disputes arose that led to the filing of this civil action, LeCann placed trust and confidence in Cobham and yielded to Cobham's management actions and decisions.

[10]    At some time in 2007, Cobham began a long series of complicated, wrongful, self-dealing transfers ("Transfers") of funds belonging primarily to four of the Joint Entities: the North Hills Practice, the Durham Practice, the Burlington Practice and the Apex Practice ("Damaged Joint Entities").  Cobham effected these Transfers in a number of ways.  The Transfers involved the transferring of funds from the Damaged Joint Entities to the Winston-Salem II Practice and to Cobham's individually-owned practice, the Winston-Salem I Practice.  These funds were transferred using online banking and company checks written by Cobham, her sister and others acting under Cobham's direction.  Cobham also frequently transferred funds between the Damaged Joint Entities without authority or a good faith reason.  Few, if any, of the Transfers by Cobham were approved by LeCann.  At times, the Transfers were concealed from

LeCann, and at other times, LeCann learned or was informed about Transfers after the fact.

[11]    The Transfers by Cobham also included self-dealing loans to Cobham and unjustified expense reimbursements to Cobham.  For example, Cobham charged to various Damaged Joint Entities the following personal expenses: (a) mortgage payments on a Charlotte condominium occupied by her brother, (b) accommodations at the Ritz Carlton in Charlotte, (c) purchases at North Hills Regency Theaters (d) purchases at Saks Fifth Avenue (Cobham bought Prada shoes and attempted to legitimize the purchase as a "uniform" expense), (e) purchases at Belk, (f) a Match.com account and (g) other expenditures.  Cobham admitted that she drove her Bentley on a trip to the movies and charged the excursion to the Damaged Joint Entities as a business expense.  These Transfers and charges were not fair to the Damaged Joint Entities, and Cobham offered no legitimate explanation to justify such expenses.

[12]    By way of the Transfers, Cobham engaged in knowing and willful self-dealing and conflict-of-interest transactions, to the material economic detriment of the Damaged Joint Entities and LeCann.

[13]    At trial, Cobham failed to establish that the Transfers were fair in all material respects to the Damaged Joint Entities.

[14]    When LeCann became aware of the Transfers, LeCann objected.  LeCann communicated her objections to Cobham on multiple occasions.  LeCann sent e-mails to Cobham expressing her disapproval of the Transfers.  In the course of doing so, LeCann demanded that the funds from such Transfers be returned to the Damaged Joint Entities.

[15]    Cobham acknowledged she received LeCann's objections and demands with regard to the Transfers.

[16]    Cobham's conduct with regard to the management of the Joint Entities resulted in deadlock with LeCann.  Ultimately, Cobham and LeCann's personal and professional relationship deteriorated and detrimentally impacted their ability to co-manage the Joint Entities effectively.

[17]    On September 29, 2010, the court ordered the Joint Entities dissolved pursuant to G.S. 55-14-30 and appointed a Receiver to manage and wind up the affairs of the Joint Entities.  On December 9, 2010, the court approved employment of a Receiver's Certified Public Accountant, Tom Boyle ("Boyle"), of Boyle CPA, PLLC.[6] Boyle was assigned the task of investigating and reporting to the court the nature and extent of the Transfers and transactions between the Winston-Salem I Practice and the Joint Entities.  Boyle undertook that task but was unable to complete his accounting assignment because the Transfers were so numerous and not properly documented. As a result, a complete and accurate accounting was virtually impossible.

[18]    The Joint Entities used the QuickBooks accounting software.  The QuickBooks files for the relevant periods of time in this case were not properly maintained and are not accurate.  Boyle expended a significant amount of time and resources attempting to reconcile the QuickBooks files with supporting documentation. Despite these efforts, a complete audit trail for all the Transfers and intercompany transactions at issue in this case could not be developed.

---

[6] Boyle previously served as Special Master in this matter, pursuant to the court's Order of August 2, 2010, for the purpose of undertaking an accounting of the Joint Entities.

[19]  The fact that an accurate accounting for and/or audit of the Joint Entities was not possible was a result of Cobham's Transfers involving the Joint Entities.

[20]  At times material, either directly or through the Winston-Salem II Practice and Winston-Salem I Practice, Cobham transferred, misappropriated, converted, diverted or otherwise obtained money or other value from the Damaged Joint Entities for her benefit or for the ultimate benefit of her solely-owned Winston-Salem I Practice.

[21]  Cobham repeatedly ignored corporate formalities between the Joint Entities and did so knowingly and to her own benefit.  In the course of her wrongful actions with regard to the Damaged Joint Entities, Cobham ignored the corporate boundaries and structures between the five Joint Entities and her solely-owned dental practice, Winston-Salem I.  Cobham repeatedly, knowingly and purposefully commingled assets and monies of the various Joint Entities with those of the Winston-Salem I Practice without regard to their respective corporate identities.

[22]  On various occasions relevant to the issues in this action, including her trial testimony, Cobham acknowledged the self-dealing nature of many of the Transfers she made between the Damaged Joint Entities and the Winston-Salem II Practice, the Winston-Salem I Practice or herself.  Cobham admitted that she repeatedly made the Transfers without authority and without seeking approval from LeCann and sometimes over the objections of LeCann.  Cobham contended that she provided more money to the Damaged Joint Entities than she received.  However, Cobham's contention was undocumented and unsupported by credible evidence at trial.

[23]  Many of the Transfers were made from the bank accounts of the Damaged Joint Entities when they had negative cash balances at the time of the

transactions. As a result, Cobham's wrongful actions proximately caused the Damaged Joint Entities to incur bank overdraft charges in the collective amount of $54,388.

[24] Cobham wrongfully and repeatedly transferred money out of the Damaged Joint Entities by making loans to the Winston-Salem I Practice or herself, receiving unauthorized expense reimbursements and providing unjustified distributions to herself.

[25] Notwithstanding the difficulty in reconstructing the accounting books and records of the Joint Entities, LeCann has carried the burden of proving, and the court finds, that Cobham's wrongful actions proximately resulted in a collective total of $559,888 in compensatory damages being suffered by the respective Damaged Joint Entities, as follows:

(a) North Hills Practice: (i) wrongful loans from the North Hills Practice to Cobham and her Winston-Salem I Practice, as to which there remains a net loan balance due and owed to the North Hills Practice, in the amount of $211,081, (ii) bank charges to the North Hills Practice as a result of bad checks authorized by Cobham in the amount of $18,659 and (iii) an unreimbursed health insurance expense owed by Cobham to the North Hills Practice in the amount of $4,500. The amount of total provable compensatory damages owing by Cobham to the North Hills Practice therefore is $234,240.

(b) Durham Practice: (i) wrongful loans from the Durham Practice to Cobham and her Winston-Salem I Practice, as to which there remains a net loan balance due and owed to the Durham Practice, in the amount of $50,313, (ii) bank charges to the Durham Practice as a result of

bad checks authorized by Cobham in the amount of $15,484 and (iii) unjustified expenses wrongfully charged to the Durham Practice by Cobham in the amount of $109,172. The amount of total provable compensatory damages owing by Cobham to the Durham Practice therefore is $174,969.

(c)     Apex Practice: (i) wrongful loans from the Apex Practice to Cobham and her Winston-Salem I Practice, as to which there remains a net loan balance due and owed to the Apex Practice, in the amount of $41,219, (ii) bank charges to the Apex Practice as a result of bad checks authorized Cobham in the amount of $9,527 and (iii) unjustified expenses wrongfully charged to the Apex Practice by Cobham in the amount of $25,054. The amount of total provable compensatory damages owing by Cobham to the Apex Practice therefore is $75,800.

(d)     Burlington Practice: (i) wrongful loans from the Burlington Practice to Cobham's Winston-Salem I Practice, as to which there remains a net loan balance due to the Burlington Practice, in the amount of $8,096, (ii) bank charges to the Burlington Practice as a result of bad checks authorized Cobham in the amount of $10,718 and (iii) unjustified expenses wrongfully charged to the Burlington Practice by Cobham in the amount of $56,065. The amount of total provable compensatory damages owing by Cobham to the Burlington Practice therefore is $74,879.

[26]     The respective Damaged Joint Entities are entitled to recovery of the foregoing amounts from Cobham as compensatory damages.

[27]     The Winston-Salem II Practice over time was completely absorbed into the Winston-Salem I Practice, and the Winston-Salem II Practice no longer exists as a separate operating entity.  LeCann's only claim for relief as to the Winston-Salem II Practice is her contention that Cobham's wrongful actions with regard to the Joint Entities caused the value of the Winston-Salem II Practice to be destroyed in 2009. While it may well be the case that Cobham's egregiously wrongful actions causally led to the demise of the Winston-Salem II Practice, LeCann has not carried her burden of proof on this issue.

[28]     LeCann's personal claim for damages relative to the alleged lost value of the Damaged Joint Entities is too speculative to be capable of proof on the evidence before the court, and therefore LeCann has not carried her burden of proof as to such contended damages.

[29]     Cobham's knowing wrongful conduct was intentional and was in breach of her fiduciary duties to the Damaged Joint Entities and damaged the Joint Entities in the amounts listed in paragraph 25 above.  Cobham's breach of her fiduciary duties constituted constructive fraud.  Cobham intentionally engaged in this constructive fraud, consciously using her position of trust to cause harm to the Joint Entities and LeCann. The Damaged Joint Entities collectively are entitled to compensatory damages in the amount of $559,888.

[30]     Cobham's conduct of self dealing and constructive fraud as to the Joint Entities was willful or wanton.  LeCann has proven that Cobham's conduct as to the Joint Entities was willful or wanton by clear and convincing evidence.

[31]     Cobham was well aware of the probable consequences of her wrongful conduct with regard to the Joint Entities and LeCann.

[32]     Cobham's wrongful conduct with regard to the Joint Entities and LeCann continued over a long period of time.

[33]     Cobham's willful or wanton conduct and intentional constructive fraud supports an award of punitive damages to the Damaged Joint Entities.  In the exercise of its discretion as finder of fact in this matter, the court determines that a punitive damages award from Cobham to the Damaged Joint Entities should be three times[7] the compensatory damages suffered by each of the Damaged Joint Entities, as reflected in paragraphs 25 and 29 of this Judgment, for a total punitive damages award of (a) $702,720 to the North Hills Practice, (b) $524,907 to the Durham Practice, (c) $227,400 to the Apex Practice and (d) $224,637 to the Burlington Practice.  The total amount of punitive damages awarded to the Damaged Joint Entities therefore is $1,679,664.  The court finds that this amount bears a rational relationship to the sum necessary to punish Cobham for her egregiously wrongful acts and to deter her and others from committing similar wrongful acts.

---

[7] The court is limited to this award by G.S. 1D-25(b), which limits a punitive damages award to three times the amount of compensatory damages or $250,000, whichever is greater.

## CONCLUSIONS OF LAW

BASED UPON the foregoing FINDINGS of FACT, the court reaches the following CONCLUSIONS of LAW:[8]

[34]    On July 12, 2010, LeCann filed her Complaint in this matter, by which she alleges eight claims for relief ("Claim(s)"): Count I (Removal of Director) ("Claim One"); Count II (Breach of Fiduciary Duty to Plaintiff) ("Claim Two"); Count III (Derivative Claim - Breach of Fiduciary Duty, Mismanagement and Waste) ("Claim Three"); Count IV (Derivative Claim - Conversion, Money had and Received, and Money on an Account) ("Claim Four"); Count V (Tortious Interference with Contracts and Prospective Economic Advantages) ("Claim Five"); Count VI (Derivative Claim - Tortious Interference with Contracts and Prospective Economic Advantages) ("Claim Six"); Count VII (Derivative and Individual - Unfair and Deceptive Trade Practices) ("Claim Seven") and Count VIII (Derivative Action - Conflict of Interest and Self-Dealing) ("Claim Eight").

[35]    Cobham timely answered and asserted a counterclaim against LeCann individually, crossclaims against the Joint Entities and third-party claims against MHP and SCNL ("Answer").

[36]    In its Order on Motion for Dissolution and Appointment of Receiver ("Dissolution Order"), entered on September 29, 2010, the court dissolved the Joint Entities pursuant to G.S. 55-14-30, dissolved the Real Estate Companies pursuant to G.S. 57C-6-02 and appointed Dr. Joseph Laton, D.D.S. ("Dr. Laton") to serve as the Receiver for the Joint Entities ("Receiver").  Upon satisfactory completion of the essential duties assigned him by the court, and by Order of the court entered on March

---

[8] For purposes of clarity, the court elects to discuss the respective Claims out of numerical order.

8, 2011, Dr. Laton was discharged by consent of the parties as Receiver and Christine F. Mayhew, Esq. was appointed Substitute Receiver for the Damaged Joint Entities.[9] Mayhew remains Receiver for the Damaged Joint Entities.

[37]    By virtue of the Dissolution Order, Claim One, and the claims alleged by Cobham in the Answer, are deemed MOOT,[10] and no further orders with respect to them are required.

[38]    The remaining seven Claims are either individual or derivative claims alleged against Cobham.  The court first will address the derivative Claims and then the individual Claims.

I.

Plaintiff's Derivative Claims

Breach of Fiduciary Duty, Mismanagement and Waste (Claim Three); Conversion, Money Had and Received, and Money on an Account (Claim Four); Tortious Interference With Contracts and Prospective Economic Advantages (Claim Six); Unfair and Deceptive Trade Practices (Claim Seven) and Conflict of Interest and Self-Dealing (Claim Eight)

A.

Demand Requirement

[39]    Cobham has taken the position in this litigation that LeCann failed to make demand pursuant to G.S. 55-7-42 prior to asserting the derivative Claims, specifically Claims Three, Four and Eight.

---

[9] The court did not appoint Mayhew as Receiver for the Winston-Salem II Practice or any entities owned by Cobham and LeCann other than the Damaged Joint Entities, having concluded that such an appointment is not necessary to resolution of this action.
[10] Cobham's claims for relief alleged in the Answer sought to remove LeCann as a director of the Joint Entities, dissolve the Joint Entities and appoint a receiver for the Joint Entities.  In a prior order, the court concluded that any claim seeking to dissolve the Joint Entities and appoint a receiver is MOOT.  *See* Op. & Order Mots. Summ. J. 5-6 (N.C. Super. Ct. Aug. 2, 2011).

[40]    LeCann responds that on numerous occasions, and more than ninety days before filing the Complaint, she made written demand upon Cobham to stop her alleged misappropriation of corporate funds.  In support of this contention, LeCann offered copies of e-mails and testimony, in which Cobham acknowledges that LeCann objected to Cobham's transfers of funds to the Winston-Salem I Practice.

[41]    This court previously has concluded that LeCann made proper demand on the Joint Entities prior to asserting the derivative Claims by clearly and particularly giving Cobham reasonable notice as to the substance of LeCann's objections.[11]  In light of the court's prior conclusion, the court does not need to revisit the issue of demand. Therefore, the court CONCLUDES that LeCann made proper demand before asserting the derivative Claims.

B.

Breach of Fiduciary Duty (Claim Three)

[42]    It is well established that by engaging in self-dealing and/or conflict-of-interest transactions, a corporate director breaches his or her fiduciary duties to the corporate entity.  *In re Brokers, Inc.*, 363 B.R. 458, 474 (Bankr. M.D.N.C. 2007) (citing *Meiselman v. Meiselman*, 309 N.C. 279, 308 (1983)).  Further, "a breach of fiduciary duty amounts to constructive fraud."  *Compton v. Kirby*, 157 N.C. App. 1, 16 (2003); *see also Governor's Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 249-50 (2002) ("Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty" in order to prove a constructive fraud claim); *HAJMM v. House of Raeford Farms*, 94 N.C. App. 1, 12 (1989) (reversed on other grounds) (stating the same).

---

[11] Op. & Order Mots. Summ. J. 7-9 (N.C. Super. Ct. Aug. 2, 2011).

[43]     Cobham clearly owed a fiduciary duty to the Joint Entities by virtue of her position as a director.  The Transfers were unjustified and unfair to the Joint Entities.  As such, Cobham's conduct constituted a breach of her fiduciary duty to the Joint Entities.  Due to Cobham's conduct, the Damaged Joint Entities suffered financial injuries.  Accordingly, LeCann is entitled to derivative recovery in their behalf under Claim Three of the Complaint.

[44]     Under the facts of this matter, the court CONCLUDES that Cobham's knowing breach of her fiduciary duties constituted constructive fraud against the Damaged Joint Entities.  Accordingly, the Damaged Joint Entities are entitled to recovery of compensatory damages proximately suffered as a result of Cobham's breach of her fiduciary duties and her constructive fraud.

[45]     LeCann further contends that the Damaged Joint Entities are entitled to a punitive damages award based on Cobham's constructive fraud and willful or wanton conduct.

[46]     To recover for punitive damages, a plaintiff must show that the defendant is liable for compensatory damages and must also show by clear and convincing evidence the presence of an aggravating factor related to the injury, including fraud, malice, or willful or wanton conduct.  G.S. 1D-15(a)-(b).  Indeed, "[p]unitive damages are justified in cases of constructive fraud . . . as long as 'some compensatory damages have been shown with reasonable certainty.'" *Compton,* 157 N.C. App. at 21 (quoting *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 549 (1987)); *see also Stone v. Martin*, 85 N.C. App. 410, 418 (1987) (stating that punitive damages may be awarded based on a wrongdoer's breach of fiduciary duty, as such conduct constitutes fraud).

[47]     In addition to the clear and convincing evidence of Cobham's constructive fraud, an award of punitive damages is warranted based upon the similarly clear and convincing evidence of her willful or wanton conduct.  Willful or wanton behavior are those acts done by a wrongdoer in conscious or intentional disregard for the rights of other parties and which the wrongdoer either knows or should know are reasonably likely to cause harm or injury.  G.S. 1D-5(7); *see also Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531 (2007).

[48]     Here, an award of punitive damages is appropriate based upon Cobham's breach of her fiduciary duties, as well as her willful or wanton conduct, both of which LeCann has proven by clear and convincing evidence.  Cobham knowingly and purposefully engaged in repeated self-dealing and conflict-of-interest actions that caused the Damaged Joint Entities to suffer from devastating cash-flow problems, and which caused material financial injuries to the Damaged Joint Entities.  Accordingly, the court CONCLUDES that an award of punitive damages against Cobham and in favor of the Damaged Joint Entities is appropriate in this matter.

C.

Conversion, Money had and Received, and Money on an Account (Claim Four)

[49]     The allegations of Claim Four are substantially the same as those of Claim Eight, and the court elects to discuss Claim Eight out of turn.  Plaintiff did not argue for recovery under Claim Four in either her pre-trial or post-trial briefs.  Accordingly, the court deems Claim Four to have been ABANDONED.

D.

### Self-Dealing and Conflict-of-Interest Transactions (Claim Eight)

[50]     It is undisputed that Cobham engaged in self-dealing, conflict-of-interest transactions.  The more pertinent issue at trial was whether the Transfers were fair, just and reasonable to the corporation.

[51]     An adversely interested party must prove that the self-dealing or conflict-of-interest transaction was fair, just and reasonable to the corporation at the time the transaction was entered into.  G.S. 55-31.  "The law presumes that such conveyances are invalid and imposes upon the purchaser the burden of establishing that the purchase is fair, open, and free from imposition, undue advantage, actual or constructive fraud."  *Green River Mfg. Co. v. Bell*, 193 N.C. 367, 371 (1927).  Loans from the corporation to directors are specifically prohibited unless approvals are obtained from disinterested directors.  G.S. 55-32.

[52]     Cobham attempted to explain the fairness of her self dealing by testifying that she transferred money back and forth between the Winston-Salem I Practice and the Joint Entities.  Cobham stated that she had transferred more money into the Joint Entities than she caused to be transferred out of the Joint Entities.  However, Cobham's self-serving testimony was not supported by the evidence at trial, which reflected, among other things, a substantial net loan balance owed to the Damaged Joint Entities from the Winston-Salem I Practice and Cobham.

[53]     The court CONCLUDES that the Damaged Joint Entities were financially injured as a result of Cobham's self-dealing and conflict-of-interest Transfers.  As such, LeCann is entitled to derivative recovery on their behalf under Claim Eight.

E.

Tortious Interference with Contract and Prospective
Economic Advantages (Claim Six)

[54]    "A claim for tortious interference with contract exists where the defendant knows of a contractual relationship between two parties and without justification induces one party to breach the contract." *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 190-91 (1993).  A party that has been damaged by another party's tortious interference with a contractual right "may recover his actual damages" as a result of the wrongdoer's conduct. *Id.*

[55]    Here, LeCann, both individually[12] and derivatively, alleges Claims against Cobham for tortious interference with contracts, seeking to recover damages resulting from the wrongful conduct.  Specifically, LeCann contends that Cobham's self-dealing transactions diverted funds from the Damaged Joint Entities causing them to fail to perform contractual obligations with third parties.  Consequently, such third parties altered their relationships and performance of contractual obligations with the Joint Entities causing harm to both LeCann and the Joint Entities.

[56]    As support for this Claim, LeCann contends that, as a result of Cobham's wrongful conduct, the Damaged Joint Entities declined in value due to their failure to meet contractual obligations with lenders, vendors, employees and others.  In calculating the lost value, LeCann appears to value the Joint Entities using a formula factoring in revenues of the Joint Entities, as well as other factors, such as offers to purchase the Joint Entities made by potential buyers and the listed selling price of the Winston-Salem II practice.

---

[12] *See* Claim Five.

[57]     Under the evidence before the court, and the facts found at trial, the court CONCLUDES that the showing of damages resulting from Cobham's alleged tortious interference with contracts is too speculative and has too many independent variables to support Claim Six.  Plaintiff has not persuaded the court that Cobham's wrongful behavior caused measurable harm to the prospective economic advantage of all or any of the Damaged Joint Entities.  The court has already awarded compensatory and exemplary relief for the actual harm proximately flowing from Cobham's self-dealing transactions, and concludes that relief to Plaintiff through this Claim Six is not supported by the facts found.  Accordingly, LeCann is not entitled to derivative recovery on behalf of the Damaged Joint Entities under Claim Six.

F.

Unfair and Deceptive Trade Practices (Claim Seven)

[58]     Plaintiff contends that Cobham's actions constituted unfair and deceptive practices sufficient to support an actionable claim under G.S. 75-1.1 ("Chapter 75").  To recover pursuant to such a claim a plaintiff must show that (a) the defendant engaged in an unfair or deceptive practice or act, (b) in or affecting commerce and (c) such act proximately caused actual injury to the plaintiff.  *Governor's Club*, 152 N.C. App. at 250 (citing *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 664 (1995)).

[59]     Upon close examination of the unique facts of this matter, the court CONCLUDES that although the intracorporate actions of Cobham were wrongful and actionable, as reflected in this Judgment, they do not support a Chapter 75 Claim. Accordingly, LeCann is not entitled to derivative recovery on behalf of the Damaged Joint Entities under Claim Seven.

II.

Plaintiff's Individual Claims

A.

Breach of Fiduciary Duty (Claim Two);
Unfair and Deceptive Trade Practices (Claim Seven);
Tortious Interference with Contract and
Prospective Economic Advantages (Claim Five)

[60]     LeCann contends that in addition to derivative recovery against Cobham on behalf of the Damaged Joint Entities, she also should be able to recover personally against Cobham for Cobham's wrongful actions as alleged in the Complaint and clearly proved at trial.

[61]     It is a well-established rule in North Carolina that corporate shareholders cannot bring actions in their individual capacity to enforce causes of action accruing to the corporation. *Barger v. McCoy Hillard & Parks,* 346 N.C. 650, 658 (1997); *Fulton v. Talbert*, 255 N.C. 183, 185 (1961).  This principle has become known as the *Barger* rule.

[62]     There are, however, two exceptions to the *Barger* rule:

> [A] shareholder may maintain an individual action against a third party for an injury that directly affects the shareholder, even if the corporation also has a cause of action arising from the same wrong, if the shareholder can show that the wrongdoer owed him a special duty or that the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself.

*Regions Bank v. Reg'l Prop. Dev. Corp.*, 2008 NCBC 8, ¶ 45 (N.C. Super. Ct. Apr. 21, 2008) (quoting *Barger*, 346 N.C. at 658-59).

[63]    The facts found in this case show that the actions of Cobham were wrongful, calculated and egregious.  However, those actions were done substantially in derogation of the rights and interests of the Damaged Joint Entities.  It is true that LeCann suffered fiscal injury as a result, but under the proofs offered here, LeCann's material injuries proximately resulted from her status as a shareholder of the Damaged Joint Entities.  Accordingly, the court CONCLUDES that LeCann has failed to bring her Individual Claims within either of the two exceptions to the *Barger* rule, and under the facts of this case, LeCann does not have standing in her individual capacity as a shareholder of the Joint Entities to bring any of her individual Claims against Cobham.

III.

A.

<u>Defendant's Motion to Reconsider Court's Announced Ruling<br>on Transfer Agreements</u>

[64]    On December 9, 2010, the court authorized the Receiver to go forward with four transfer agreements ("Transfer Agreements"), whereby the Receiver offered to transfer to LeCann and Cobham, individually, practice locations and assets of four of the Joint Entities.  The transfer was anticipated to be in exchange for assumption and ultimate satisfaction by LeCann and Cobham of certain debts and obligations associated with the respective dissolved Joint Entities involved.

[65]    Pursuant to the Transfer Agreements, LeCann assumed the obligations related to the North Hills and Apex Practices, and Cobham assumed the obligations related to the Durham and Burlington Practices.  Effective December 1, 2010, LeCann and Cobham began operating new, solely-owned dental practices from the old locations.

[66]   On April 5, 2011, LeCann filed a Motion for Relief for Defendant Cobham's Breach of Agreements with Receiver ("Transfer Motion").  In the Transfer Motion, LeCann alleges that Cobham failed to comply with the requirements of the Transfer Agreements by failing to fulfill her obligations to pay all secured debts and obtain releases of the dissolved jointly-owned dental practices and LeCann from such secured debts.  Among other things, LeCann sought to have the court void the transfers to Cobham of dental practices in Durham and Burlington that were effected as a result of the Transfer Agreements and to authorize the Receiver to transfer the two practices to LeCann.

[67]   The court heard argument on the Transfer Motion on May 11, 2011. Subsequently, the court announced to counsel for the parties its conclusion that Cobham materially had breached the Transfer Agreement and informed the parties that the court intended to grant the Transfer Motion.  Thereafter, on May 25, 2011, prior to entry of an order relative to the court's indicated ruling on the Transfer Motion, Cobham filed her Motion to Reconsider Announced Order with Respect to the Transfer of Practices ("Motion to Reconsider"), in which she asked the court to withdraw its announced ruling on the Transfer Motion.

[68]   In light of the rulings in this Judgment, and other evidence of record, the court CONCLUDES, in the interests of justice, that the Motion to Reconsider should be GRANTED.  Accordingly, the court's prior oral ruling on the Transfer Motion hereby is WITHDRAWN.  No further action by the court relative to the Transfer Motion or the Motion to Reconsider is necessary.

B.

Constructive Trust

[69]    Among other remedies in this matter, LeCann asks the court to impose a constructive trust upon certain assets received and/or held by Cobham.

[70]    A constructive trust is an equitable remedy "to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." *Roper v. Edwards*, 323 N.C. 461, 464 (1988) (internal quotations omitted) (quoting *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198 211-12 (1970) (superseded by statute on other grounds)).  The award of a constructive trust does not preclude the prevailing party from also being awarded damages.  *Speight v. Branch Banking & Trust Co.*, 209 N.C. 563, 566 (1936) ("[E]quity applies the principles of constructive trusts wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrongdoer.").

[71]    Here, there is ample evidence establishing a breach of fiduciary duty on the part of Cobham and that Cobham profited and benefited from the breaches of fiduciary duty owed to the Joint Entities.  However, in the context of this matter and in view of the harsh remedy being imposed by this Judgment, the court CONCLUDES that a constructive trust is not a mechanism that will be of further material benefit in remedying the transgressions of Cobham with regard to the Damaged Joint Entities or LeCann.  Accordingly, the court does not impose a constructive trust as part of the Judgment in this matter.

C.

Winston-Salem I Practice

[72]    Previously in this Judgment, the court has found and CONCLUDED that in the course of her wrongful actions with regard to the Damaged Joint Entities, Cobham ignored the corporate boundaries and structures between the five Joint Entities and her solely-owned dental practice, the Winston-Salem I Practice.  Consequently, for purposes of this Judgment, Cobham and the Winston-Salem I Practice are considered to be the alter ego of each other.  Therefore, to the extent this Judgment finds and concludes that any unpaid monetary loans wrongfully were caused by Cobham to be made to the Winston-Salem I Practice from any of the Damaged Joint Entities, Cobham shall have personal liability for such unpaid loans.

CONCLUSION

NOW THEREFORE, based upon the foregoing FINDINGS of FACT and CONCLUSIONS of LAW, it hereby is ORDERED, ADJUDGED AND DECREED, that Judgment in this matter is ENTERED as follows:

[73]    Plaintiff SHARON COBHAM, D.D.S. & NICOLE LECANN, D.D.S. IV, P.A. (a/k/a NORTH HILLS FAMILY DENTAL CARE), shall have and recover from Defendant Sharon J. Cobham the amount of Two Hundred Thirty-Four Thousand Two Hundred Forty ($234,240) Dollars, as compensatory damages.

[74]    Plaintiff SHARON COBHAM, D.D.S. & NICOLE LECANN, D.D.S. V, P.A. (a/k/a DURHAM FAMILY DENTAL CARE), shall have and recover from Defendant Sharon J. Cobham the amount of One Hundred Seventy-Four

Thousand Nine Hundred Sixty-Nine ($174,969) Dollars, as compensatory damages.

[75]     Plaintiff SHARON JOVANNA COBHAM, D.D.S. & NICOLE LECANN, D.D.S. & ASSOCIATES, P.A. (a/k/a APEX FAMILY DENTAL CARE), shall have and recover from Defendant Sharon J. Cobham the amount of Seventy-Five Thousand Eight Hundred ($75,800) Dollars, as compensatory damages.

[76]     Plaintiff SHARON J. COBHAM, D.D.S. & NICOLE LECANN, D.D.S., P.A. (a/k/a ANNE ELIZABETH FAMILY DENTAL CARE) shall have and recover from Defendant Sharon J. Cobham the amount of Seventy-Four Thousand Eight Hundred Seventy-Nine ($74,879) Dollars, as compensatory damages.

[77]     Plaintiff SHARON COBHAM, D.D.S. & NICOLE LECANN, D.D.S. IV, P.A. (a/k/a NORTH HILLS FAMILY DENTAL CARE) shall have and recover from Defendant Sharon J. Cobham the amount of Seven Hundred Two Thousand Seven Hundred Twenty ($702,720) Dollars, as punitive damages.

[78]     Plaintiff SHARON COBHAM, D.D.S. & NICOLE LECANN, D.D.S. V, P.A. (a/k/a DURHAM FAMILY DENTAL CARE) shall have and recover from Defendant Sharon J. Cobham the amount of Five Hundred Twenty-Four Thousand Nine Hundred Seven ($524,907) Dollars, as punitive damages.

[79]     Plaintiff SHARON JOVANNA COBHAM, D.D.S. & NICOLE LECANN, D.D.S. & ASSOCIATES, P.A. (a/k/a APEX FAMILY DENTAL CARE) shall have and recover from Defendant Sharon J. Cobham the amount of Two

Hundred Twenty-Seven Thousand Four Hundred ($227,400) Dollars, as punitive damages.

[80]    Plaintiff SHARON J. COBHAM, D.D.S. & NICOLE LECANN, D.D.S., P.A. (a/k/a ANNE ELIZABETH FAMILY DENTAL CARE) shall have and recover from Defendant Sharon J. Cobham the amount of Two Hundred Twenty-Four Thousand Six Hundred Thirty-Seven ($224,637) Dollars, as punitive damages.

[81]    Interest on the foregoing awards shall be taxed to Defendant Sharon J. Cobham as provided by law.

[82]    Taxable costs shall be charged to Defendant Sharon J. Cobham.

[83]    Pursuant to the court's Order entered on November 10, 2011, the Substitute Receiver shall undertake to collect upon this Judgment, receive the assets collected and apply them with regard to the dissolved Damaged Joint Entities according to law.

This the 7th day of November, 2012.